[No. B158569. Second Dist., Div. Two. Dec. 2, 2003.]

NINETY NINE INVESTMENTS, LTD., Plaintiff and Appellant, v. OVERSEAS COURIER SERVICE (SINGAPORE) PRIVATE, LTD., Defendant and Respondent.

## Counsel

Ezer Williamson & Brown, Mitchel J. Ezer and Richard E. Williamson for Plaintiff and Appellant.

Michael A. Chodos for Defendant and Respondent.

## Opinion

**DOI TODD, J.**—Appellant Ninety Nine Investments, Ltd., as the buyer, sought specific performance of a real estate purchase and sale agreement from respondent Overseas Courier Service (Singapore) Private, Ltd. (Overseas), the seller. Following a bench trial, the court denied specific performance and awarded judgment in favor of Overseas. Appellant contends that it was ready, willing and able to perform, but that it was prevented from performing by Overseas. We agree and reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Agreement*

Appellant and Overseas each have a one-half interest in Brighton Villas, LLC, which owns a 62-unit apartment building and a 39-unit apartment building in Los Angeles. On October 5, 1999, the parties entered into a written agreement for appellant to purchase Overseas' undivided one-half interest in each of the properties (the agreement), in order to dissolve the parties' partnership. Overseas wanted to structure the transaction as a tax deferred exchange under Internal Revenue Code section 1031 and the parties agreed that appellant would receive a credit of $235,000 in consideration for its cooperation with the exchange. Appellant was also required to pay off one-half of the existing loans on the properties, and excluding such costs as escrow fees, title charges and loan fees, appellant was expected to pay approximately $7.4 million to close the deal.

Throughout the transactions, appellant was represented by Mark Jen and Overseas by Jack Chan. Messrs. Jen and Chan are second cousins and both men are licensed real estate agents and sophisticated and experienced real estate investors. They were not on speaking terms after the agreement was signed.

The agreement identified the seller as Jack Chan (on behalf of Overseas) and the buyer as Mark Jen (on behalf of appellant). It provided that the transactions would be handled through two separate escrows at First American Title Company of Los Angeles (FATCOLA), and that the escrows would close on or before January 14, 2000.[1] The agreement also provided: "New financing to be obtained and all related fees to such loan(s) to be the buyer's responsibility," and "Time is of the essence." Chan and Jen both testified that there was no particular significance to the date chosen for the closing; they simply estimated it would take approximately 90 days for Overseas to locate property for the 1031 exchange and for appellant to secure financing. The parties stipulated during trial that the purchase prices were adequate and the agreement was "just and reasonable."

*The Escrows*

Over the next month and a half, the parties exchanged five drafts of escrow instructions. Finally, on November 27, 1999, Mona Parvinian, the escrow

---

[1] The agreement actually specified January 15, 2000, as the closing date. When the parties realized this date fell on a Saturday, they agreed to treat Friday, January 14, 2000, as the closing date. The escrow instructions identified January 14, 2000, as the closing date. The trial court took judicial notice that the following Monday, January 17, 2000, was Martin Luther King, Jr., Day.

officer in charge, circulated the final draft of the escrow instructions for each property, which provided in relevant part:

"(C) NEW LOAN: Buyer may have the option to obtain a new first deed of trust loan in favor of lender of Buyer's choice, . . . proceeds of which shall be used towards purchase price herein. However, this shall NOT be a contingency. [¶] . . . [¶]

"(J) LOS ANGELES CITY REPORT: If applicable, Seller agrees to furnish in escrow a Report of Residential Property Records and Pending Special Assessments Liens covering the subject property as issued by the City of Los Angeles prior to the close of this escrow. Escrow Holder's sole concern herein shall be to obtain said report on behalf of Seller herein and to deliver a copy of same to Buyer prior to close of escrow . . . .

"(K) RENT STATEMENT: Seller shall furnish in escrow, for approval by Buyer, a current Rent Statement showing all rents, security deposits, last month's rents and/or any other refundable deposits. Escrow Holder is instructed to credit the account of the Buyer and charge the account of the Seller with all deposits as set forth in such Rent Statement. . . . Buyer shall rely solely on the Rent Statement provided herein by Seller for all purposes as required in the escrow.

"(L) TAX DEFERRED EXCHANGE: Buyer and Seller each agree to cooperate with the other in effecting an IRC Section Like Kind Tax Deferred Exchange at anytime prior to the close of this escrow. . . . If either party or both parties elect to effect such exchange, each party herein agrees that they will execute additional escrow instructions, documents, agreements and/or instructions as may be required to effect either parties' exchange, provided that NO additional costs, expenses or liabilities shall be incurred by the 'accommodating' party AND provided that no additional delays in the scheduled closing date of this escrow are incurred unless mutually agreed upon by all parties to this transaction. . . . [¶] . . . [¶]

"(O) SATISFACTION OF CONTINGENCY: Buyer's deposit of balance of funds shall constitute their acknowledg ment that all terms, conditions and contingencies have been met."

Both sets of escrow instructions further provided: "I [Buyer] will deliver to you any additional funds and execute any instruments which are necessary to comply with the terms hereof, all of which you may use and/or deliver on or before Friday, January 14, 2000, when you hold a deed for me executed by Overseas . . . ."

The escrow instructions also provided: "TIME IS OF THE ESSENCE OF THESE INSTRUCTIONS. If this escrow is not in condition to close by

1/14/2000, and demand for cancellation is received by you from any party to this escrow after said date, you shall act in accordance with the cancellation instructions contained in the general provisions on the attached page hereof. If no demand for cancellation is made, you will proceed to close this escrow when the principals have complied with the escrow instructions."

In her November 27, 1999 cover letters, sent separately to Jen and Chan and not copied to the other, Parvinian requested that each party return certain documents, in addition to the signed escrow instructions. Parvinian's files indicated that Jen signed and returned the escrow instructions on behalf of appellant and provided the other information requested from him on December 7, 1999.

In her letter to Chan, Parvinian specifically requested that Chan "*complete, sign and return*" a loan information sheet and a 9(a) city report application, and that he furnish copies of Overseas' articles of incorporation and supporting documents. She also stated, "Your prompt attention to these items and *their return to our office will assist us in the completion of your escrow.*" Jen was not asked to provide any of this information.

Jen wrote to Chan on December 20 and 27, 1999, and January 3, 2000, asking Chan to sign the escrow instructions. In two of the letters, Jen reminded Chan of the scheduled January 14, 2000 closing date. Chan admitted that he received the letters but did not respond to them. Jen testified that he enlisted the aid of others to follow up with Chan, including Parvinian. Parvinian spoke to Chan in late December 1999 and informed him that while the agreement did not contain a deadline for submission of the escrow instructions, she could not move forward with the escrows until he provided the requested information.

Chan finally signed the escrow instructions on behalf of Overseas on Friday, January 7, 2000, one week before the closing date, but he did not deposit them into the escrows until January 11, 2000. Chan testified that he did not deposit the signed escrow instructions with FATCOLA on the day he signed them because he was driving around Los Angeles trying to locate property for the 1031 exchange, and he was told to bring the escrow papers to a meeting with Jen the following Monday afternoon.

As for other documents Overseas was required to provide to escrow, Chan did not submit the required rent roll statements until 11:57 a.m. on January 14, 2000. Chan admitted that he signed but left blank the form 9(a) city report application and the loan information sheet. Parvinian's assistant returned these blank documents to Chan for completion on January 13, 2000. Chan never filled in the missing information; instead he provided the loan

information telephonically on January 14, which was too late to allow the escrows to close that day. Chan also admitted that he never provided Overseas' articles of incorporation to FATCOLA. Finally, Chan claimed to have signed an amendment for the 1031 exchange and provided it to the third party accommodator, NB Accommodator, Inc. (NB). But the parties stipulated that NB's files did not contain an exchange agreement or amendment signed by Chan and no such amendment was ever deposited into the escrows. Parvinian testified that the escrows could not have closed without each of the documents requested from Chan. Furthermore, the receipt of documents on January 14 was too late for closing on that date because all title documents had to be recorded by 8:00 a.m. on the closing date.

### The Financing

Chan admitted that Jen informed him prior to the time the agreement was executed that appellant intended to obtain new loans to finance each of the acquisitions. At trial, Jen testified that appellant needed loans to close the transactions because it did not otherwise have liquid funds available for the purchases. On November 4, 1999, appellant submitted loan applications to Washington Mutual Bank (WMB or the lender) and paid a loan application fee of $42,281. WMB was the existing lender on the properties and appellant was seeking to refinance the loans. Jen testified that he estimated there would be a shortfall of approximately $100,000 to $200,000 between the loan amounts and the amount necessary to close the escrows, but that he had the funds to cover the shortfall.[2]

In December 1999, appellant obtained "Commitment Letters" from WMB. As is common, the loans were approved subject to various conditions. On January 5 and 25, 2000, WMB sent letters to Jen advising him that certain conditions had not been fulfilled.[3] However, Cathy Van Huisen, the bank's loan consultant who worked on the deal, testified that Jen had fulfilled all conditions to be met by the borrower and that he had done nothing to prevent the loan from funding on January 14, 2000. She testified that the only conditions remaining to fund the loan were escrow obligations.[4] Testimony

---

[2] The actual shortfall was approximately $38,000.

[3] As of January 14, 2000, the following documents had not been provided to the lender: a UCC-1 form signed by the borrower, updated preliminary title reports, updated roof certifications and methane gas reports, certified copies of the escrow instructions, estimated closing statements, demands for payoff, and certified copies of the grant deeds.

[4] For example, Jen could not sign the loan documents, including the UCC-1 form, until they were prepared by WMB, which did not occur until January 14, 2000. Van Huisen testified that preparation of the updated preliminary title reports, certified copies of the escrow instructions, the estimated closing statements, the demands for payoff and the certified copies of the grant deeds are handled by the escrow holder. With respect to the updated roof reports, Jen had submitted the original reports in December 1999. The roofs were again inspected prior to

by several witnesses revealed that loan documents are generally not prepared by the lender until requested by the escrow holder when escrow is ready to close, and that such documents are usually prepared about five business days prior to the closing date to allow time for any outstanding conditions to be fulfilled. Because Chan's signed escrow instructions were not received by FATCOLA until January 11, 2000, the loan documents were not ordered from WMB until January 13, 2000. The loan documents were prepared the next day. Van Huisen testified that the issuance of loan documents means that the lender is prepared to issue the loan. Jen testified that he signed the loan documents in Parvinian's office on January 14, 2000, and that he returned on January 21 to have his signature notarized.

When Chan contacted Parvinian on January 14 to find out if the escrows were ready to close that day, she advised him that the escrows were not in a position to close and that no funds had arrived. Overseas gave written notice of cancellation of the escrows the following day, Saturday, January 15, 2000.

*Statement of Decision*

The parties stipulated that appellant would limit its remedy to specific performance and waive all monetary damages, including any apportionment of rent and any damages incidental to a specific performance action. Overseas, in turn, waived recovery of interest on the purchase price should specific performance be awarded.

In its statement of decision, the court began by noting the parties' respective positions: "[Appellant] contends that the funding of the purchase [price] did not occur and the escrows did not close because [Overseas] either failed to provide [the] necessary information or documentation or provided them too late to close on January 14, 2000. [Overseas], on the other hand, contends that in this 'time is of the essence' transaction, [appellant's] failure to perform or to tender performance, that was not prevented by [Overseas], bars the remedy of specific performance."

Relying on the case of *Pittman v. Canham* (1992) 2 Cal.App.4th 556 [3 Cal.Rptr.2d 340], the court concluded that the parties' obligations constituted concurrent conditions. The court found that "the conduct of [Overseas] of

---

January 14 and updated certificates were prepared on Sunday, January 16. WMB's underwriter testified that he would have recommended that the loans fund without the updated certificates based upon his review of the roof conditions in the appraisal reports. Regarding the methane gas reports, Jen originally provided these in November 1999. Both properties were reinspected and cleared on January 10, 2000, and WMB agreed to accept a letter of intent from Jen stating that he would comply with any recommendations. Jen prepared this letter on January 11, 2000, which Van Huisen recalled receiving.

which [appellant] complains relates to [Overseas] not fulfilling escrow requirements, not with prevention of [appellant's] required performance regarding funding of the transaction. (Overseas' Articles of Incorporation, Amendment for 1031 Substitution, 9(a) report, rent roll statements, Loan Information Sheet . . . .) [Overseas'] failure to comply with escrow demands, did not, in [and] of itself, prevent [appellant] from tendering either cash or loan funds into escrow." In response to appellant's argument that Overseas prevented the escrow holder from providing the lender with information required to fund the transactions, the court found "there was nothing to prevent [appellant] from providing existing lender information to escrow for the purpose of escrow preparing timely payoff demands, since both [parties] jointly owned Brighton Villas, the then-existing borrower and owner of the properties. Although approval of the rent roll statements by [appellant] was a condition of closing the escrow, in order to allow a proration of rents at the closing of escrow, it was not a condition of any loan funding. For purposes of an estimated closing statement, escrow could use the rent roll provided by [appellant], as [appellant] was a joint owner of Brighton Villas, the then owner of the properties."

Thus, the court concluded that appellant "has not established that it performed its obligations by fully tendering the amounts due in escrow by the deadline date, or that it was excused or prevented from doing so by defendant. Nor has [appellant] established waiver or estoppel."[5] Judgment was entered on April 24, 2002. This appeal followed.

## DISCUSSION

I. *Substantial Evidence Does Not Support the Trial Court's Factual Findings.*

■ To obtain specific performance, appellant must establish its own performance or excuse for nonperformance. (See *Erich v. Granoff* (1980) 109 Cal.App.3d 920, 930 [167 Cal.Rptr. 538]; *Stratton v. Tejani* (1982) 139 Cal.App.3d 204, 211 [187 Cal.Rptr. 231].) A plaintiff must also show that it was ready, willing and able to perform both at the time the original contract was entered into and during the specific performance action. (*C. Robert Nattress & Associates v. CIDCO* (1986) 184 Cal.App.3d 55, 64 [229 Cal.Rptr. 33].)

Appellant contends that it was ready, willing and able to perform but that it was prevented from tendering the purchase price due to Overseas' failure to

---

[5] While appellant argued at trial that Overseas was estopped from asserting and had waived the "time is of the essence" clause of the agreement, on appeal appellant does not challenge the trial court's findings with respect to waiver and estoppel.

comply with its escrow obligations. The trial court found that Overseas did not prevent appellant's performance.

■ We review the trial court's factual findings for substantial evidence. Where findings of fact are challenged on a civil appeal, we are bound by the principal that "the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053 [68 Cal.Rptr.2d 758, 946 P.2d 427].) We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. (*Ibid.*) Here, the trial court's finding that Overseas did not prevent appellant's performance is not supported by substantial evidence.

### A. *Overseas' Performance*

Under the terms of the agreement and the escrow instructions, Overseas was required to submit certain documents to escrow. These documents included the Los Angeles city report of property records and pending special assessment liens, the rent roll statements, an amendment for the 1031 exchange, Overseas' articles of incorporation, and loan information. It was undisputed that Overseas never submitted a completed city report or the 1031 amendment. Furthermore, Overseas submitted the rent roll statements and loan information on the scheduled closing date, which made it impossible for a closing to occur on that day. The trial court correctly found that Overseas failed to comply with its escrow obligations.

But the trial court nevertheless found that Overseas' failure to comply did not prevent appellant from meeting its own obligations to tender either loan funds or cash into the escrows. This finding is contrary to the undisputed evidence in the record.

Appellant's expert witness, Collyer Church, who had more than 30 years of experience with escrows and title companies, testified that an escrow is an evolutionary process which is dependent on the orderly receipt of information, and that an escrow holder will not ask a lender to prepare loan documents until the escrow is ready to close. Employees of WMB and Mona Parvinian, the escrow officer in charge, testified to the same.

As the trial court noted, in order for the escrows to close, the escrow officer would have to prepare estimated closing statements from which can be determined the amount to be deposited by the buyer.

Although the escrow holder requested a completed loan information sheet and rent roll statements from Overseas in order to prepare the estimated

closing statements, this information was not provided by Overseas. The trial court found that because appellant and Overseas were joint owners of Brighton Villas, LLC, *appellant* could have submitted the documents to escrow. But this was not what the parties had agreed or what the agreement or the escrow instructions provided. We agree with appellant that the trial court's ruling amounted to an improper rewriting of the parties' contract.

In the agreement, the parties stated that for purposes of the transaction Jack Chan would be the seller on behalf of Overseas. Indeed, Chan signed the escrow instructions on behalf of Overseas as the seller. The escrow instructions specifically provided that "Seller shall furnish in escrow, for approval by Buyer, a current Rent Statement. . . ." While appellant may have had equal access to the required information, the escrow instructions explicitly required Overseas to provide this information. Furthermore, Parvinian never asked appellant to provide this information. Of greater significance in the context of an escrow, as both Parvinian and Church testified, because rents are prorated and deposits and repayments credited to the buyer and charged to the seller, this information must come from the seller and then be approved by the buyer in order for the escrow holder to avoid liability for having relied on erroneous information from the buyer.

Overseas attempts to downplay the significance of the documents it was required to deposit into escrow. But the uncontradicted evidence at trial revealed the necessity for each of the documents in order to close the escrows. The rent roll statements and loan information were needed by the escrow holder to prepare the estimated closing statements, which advised the buyer of the exact amount necessary to deposit to close the escrows. WMB's regional operations manager testified that estimated closing statements were required before the loans could fund. In addition, because the transaction had been structured as a tax deferred exchange, in which a third party accommodator was to accept the funds on behalf of the seller, an amendment for the 1031 exchange was necessary to identify the accommodator.

With respect to the city report, Overseas argues, without citation to any authority, that the report was not required because the transaction was an "as is" sale. But Parvinian testified that the report is required any time a transfer takes place in the city of Los Angeles. Finally, Anthony Rivera, a title officer for FATCOLA, testified that Overseas' articles of incorporation were necessary to ensure that Overseas was a valid company. The evidence was undisputed that the escrows could not close without each of these documents, and that anything that prevented the close of the escrows would constitute an impediment to funding the loans.

## B. *Appellant's performance.*

Overseas contends that appellant did not meet its own obligations because it failed to fulfill certain loan conditions by January 14, 2000. Van Huisen, the loan officer in charge of the transaction, testified that there were certain conditions that had to be fulfilled prior to funding, as was the case in almost all loan approvals. But she also testified that as of the scheduled January 14 closing date, appellant had fulfilled all of its loan conditions and had done nothing to prevent funding by that date, and that the only outstanding conditions were escrow obligations. According to Van Huisen, the loans could have funded on January 14, 2000, if the escrows had been ready to close.

Overseas argues that the loans could not have funded by January 14 because appellant did not sign the loan documents by the closing date. In this regard, Jen testified that he went to the escrow office on January 14 to sign the loan documents, but that Parvinian was busy and unable to meet with him. Jen testified that he signed the documents in a conference room and returned the following week to have his signature notarized. The deed was notarized on January 21 and the trial court found that appellant did not sign the loan documents until January 21, 2000, one week beyond the scheduled closing date. We find the actual signing date to be irrelevant. The evidence established without dispute that because Overseas did not deposit its signed escrow instructions into escrow until January 11, 2000, loan documents were not ordered from the lender until January 13 and could not be prepared until January 14. At that point, because Overseas had failed to deposit the documents it was required to deposit in a timely fashion, it was impossible for the escrows to close by January 14. This impossibility was occasioned by the acts of Overseas and not appellant. The failure by appellant to submit notarized loan documents on January 14 had no causal effect on the inability of the escrows to close prior to Chan's submission of Overseas' notice of termination. Furthermore, there was no evidence that Jen was requested to sign completed loan documents before the notice of termination.

## C. *Failure to fund by the lender by January 14.*

Overseas argues that appellant never made any demand on the lender to fund the loans by January 14, 2000. But the evidence is clear that all parties involved, including the lender, were well aware of the closing date. Furthermore, appellant had no obligation to make such a demand, and it is clear that any demand would have been futile. The evidence was uncontroverted that the loans could not fund and the escrows could not close by January 14 due to Overseas' failure to comply with its escrow obligations. Indeed, Jen's three

letters to Chan urging him to sign the escrow instructions so that the escrows could close by January 14 went unheeded.[6]

Parvinian testified that in her 16 years of escrow experience, 90 percent of all escrows closed after the scheduled closing dates, and that if Chan had not cancelled the escrows on January 15, she would have continued trying to close them. Church testified that if Chan had completed his escrow obligations and there were no other outstanding issues, the escrows would have closed and the loans funded the week following January 14. The loan documents generated by the lender on January 14 specified an estimated closing date of January 22, 2000.

### D. *Failure to pay cash by January 14.*

The trial court found that despite Overseas' breaches of its own obligations, appellant was not prevented from tendering payment in the form of cash.[7] But there was no requirement that appellant tender cash. Although the escrow instructions provided that appellant's option to obtain a loan was not a contingency, the parties' agreement and the escrow instructions expressly gave appellant the option of securing financing, and it was undisputed that appellant was in the process of doing so.

Evidence at trial suggested that the Jen family had significant real estate holdings worldwide and was quite wealthy. The trial court concluded that appellant could have simply tendered cash to close the deal. Even assuming this to be true, it is irrelevant. It defies logic to expect a buyer to tender $7.4 million in cash into an escrow when that buyer had the express option of obtaining a loan, had spent over $42,000 in loan application fees, and had

---

[6] Moreover, the parties both testified that there was no particular significance to the January 14 closing date, and that a 90-day escrow had been agreed upon to allow sufficient time for Overseas to locate property for the 1031 exchange and for appellant to secure financing. As of one week prior to his canceling the escrows, Chan had not located substitute property, and there was no evidence that he had by January 14.

[7] Overseas contends that this was a "cash deal," relying in part on the following provision in the escrow instructions: "The parties have agreed that the Buyer may if he chooses borrow new funds ('new loan') to satisfy in full the existing loan. The new loan will be the sole obligation of Buyer and not of Seller and may be collateralized by the entire property AFTER the close of escrow." Overseas argues that if the loans could not be collateralized against the property until after the close of escrow, then by definition the loans could not be a contingency. But appellant has never taken the position that obtaining the loans was a contingency of the escrow. Moreover, prior to the close of the escrows, the entire property was being used to collateralize the loans, as evidenced by the sentence in the escrow instructions immediately preceding this provision: "Included within the total consideration to be paid to Seller is 50% of the existing obligation collateralized by the entire Property which is to be repaid in full as part of this purchase ('existing loan')." It is clear that the parties anticipated that the new loans could not be collateralized by the entire property until after the escrows closed and the old loans paid off.

already obtained loan approvals and commitment letters from the lender. Indeed, Church testified that in his 30 years of experience in the escrow business he had never seen that happen. To require such a tender would not accord with commercial reality. (See, e.g., *Fogarty v. Saathoff* (1982) 128 Cal.App.3d 780, 787 [180 Cal.Rptr. 484] ["To hold that the obligation of the seller to furnish a termite report and clearance before the buyer had solidified the deal by eliminating the contingency would not accord with commercial reality"].)

We also note that the escrow instructions provided that "Buyer's deposit of balance of funds shall constitute their acknowledgment that all terms, conditions and contingencies have been met." In light of the fact that Overseas had not satisfied all of its escrow obligations by the intended closing date, it would not be reasonable to require appellant to deposit the balance of funds into escrow, thereby acknowledging satisfaction that all terms and conditions had been met.

### E. *"Time is of the Essence" and Good Faith and Fair Dealing*

Overseas relies on the "time is of the essence" provisions in the parties' agreement and escrow instructions to support its position that it was entitled to cancel the escrows. We note that this particular provision in the escrow instructions, which is set forth *ante*, is part of a preprinted standard escrow form.[8]

Overseas argues that because appellant failed to timely perform its obligations under the agreement and escrow instructions, appellant's rights thereunder expired by their own terms and Overseas therefore had the right to cancel the escrows. But as we have concluded, appellant was prepared to timely perform and was prevented from doing so by Overseas' actions. "If the cooperation of the other party is necessary for successful performance of an obligation, a promise to *give that cooperation*, and *not to do anything which prevents* realization of the fruits of performance, will often be implied. This is sometimes referred to as an implied covenant of good faith and fair dealing." (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 743, p. 674.)

Overseas points out that the covenant of good faith cannot be used to prohibit a party from doing that which is expressly permitted by agreement.

---

[8] The general provisions of the escrow instructions provide, in part, under the heading "Cancellation of Escrow": "Any party desiring to cancel this escrow shall deliver written notice of cancellation to Escrow Holder. Within a reasonable time after receipt of such notice, Escrow Holder shall send by regular mail to the address on the escrow instructions, one copy of said notice to the other party(ies). Unless written objection to cancellation is delivered to Escrow Holder by a party within 10 days after date of mailing, Escrow Holder is authorized at its option to comply with the notice and terminate escrow. . . ."

(*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374 [6 Cal.Rptr.2d 467, 826 P.2d 710]; *Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 802 [48 Cal.Rptr.2d 747]; 1 Witkin, Summary of Cal. Law (9th ed. 2003 Supp.) Contracts, § 743, p. 448.) According to Overseas, appellant is attempting to use the covenant to import the condition of obtaining financing into the parties' transaction. But appellant has never taken the position that its ability to obtain financing was a contingency of the deal. The agreement and escrow instructions expressly provided that obtaining financing was an *option* for appellant.

Based on the parties' implied covenant of good faith and fair dealing that neither party would frustrate the other party's right to receive the benefits of the contract, Overseas was not entitled to unilaterally cancel the escrows when it did.

## II. *Pittman v. Canham Has No Application Here.*

In denying specific performance to appellant, the trial court relied on *Pittman v. Canham, supra,* 2 Cal.App.4th 556. In that case the court held that the failure of both parties to a contract to perform concurrent conditions at the time for performance resulted in a discharge of both parties' duties to perform. (*Id.* at p. 560.) Appellant, in urging us not to follow *Pittman,* argues that the case is an "aberration" in the law, that it represents a "flight from commercial reality," and that it ignores 80 years of case law.[9] Appellant points out that while *Pittman* has been cited in secondary sources,[10] no published case has cited it since it was decided in 1992. Overseas responds that because *Pittman* was not the sole ground for the trial court's decision, we need not consider it.

We find *Pittman* to be factually distinguishable from the case at hand and therefore conclude it has no application here.

Pittman, a licensed real estate broker, offered to purchase a 56-acre parcel of property in San Luis Obispo from 85-year-old Lily Canham. After repeated

---

[9] The case law prior to *Pittman* was summarized as follows in 1 Miller & Starr, California Real Estate (3d ed. 2000), section 1:162, page 635: "Even though time is expressly of the essence in the contract, the weight of authority holds that since the performance by each party is dependent upon the performance by the other party, the mere failure of one party or both parties to perform mutually dependent concurrent conditions within the time specified in the contract does not terminate the contract automatically. Neither party is obligated to perform until the other party has performed, and either full performance or a tender of performance is required even when the other party has not performed in a timely manner."

[10] See, e.g., 1 Witkin, Summary of Cal. Law, *supra,* Contracts, section 737, page 443; Greenwald & Asimow, California Practice Guide: Real Property Transactions (The Rutter Group 2002). In 1 Miller & Starr, California Real Estate (3d ed. 2000) section 1:162, page 638, the authors state: "It is difficult to . . . understand the [*Pittman*] court's failure to recognize the nature of dependent concurrent conditions."

telephone calls to her from May to November 1987, Canham finally agreed to sell the property to Pittman for $250,000. (*Pittman v. Canham, supra,* 2 Cal.App.4th at p. 558.) Pittman drafted the contract dated November 24, 1987, and deposited $1,000 into escrow. The contract provided for a 30-day escrow and deposit of an additional $24,000, with the balance to be paid by a note secured by a deed of trust on the property. Both the contract and the escrow instructions provided that time was of the essence, and the contract required that any modifications or extensions be in writing. In the second week of December, Canham gave a signed copy of the escrow instructions to Pittman for delivery to escrow, and included a deed to the property which was signed but not notarized. When Pittman contacted Canham, she told him she would have the deed notarized at an escrow company near her home. The December 24 closing date came and went, and Canham had not tendered a notarized deed, nor had Pittman tendered $24,000, a promissory note, or a deed of trust. (*Ibid.*) Five months later, in May 1988, Canham told Pittman that she had entered into a contract with other purchasers to buy the property for $600,000. Pittman wrote a letter demanding that she perform on his contract, but she sold the property to the other buyers. (*Id.* at p. 559.) Pittman then sued Canham for breach of contract. The trial court's grant of nonsuit was affirmed on appeal.

The court in *Pittman* recognized that concurrent conditions are conditions precedent which are mutually dependent, and noted that the only important difference between a concurrent condition and a condition precedent is that a condition precedent must be performed before another duty arises, while a tender of performance is sufficient in the case of a concurrent condition. (*Pittman v. Canham, supra,* 2 Cal.App.4th at p. 559.) But it held that "the failure of both parties to perform concurrent conditions does not leave the contract open for an indefinite period so that either party can tender performance at his leisure. The failure of both parties to perform concurrent conditions during the time for performance results in a discharge of both parties' duty to perform. Thus, where the parties have made time the essence of the contract, at the expiration of time without tender by either party, both parties are discharged. . . . Neither party can hold the other in default and no cause of action to enforce the contract arises. (See *Pitt v. Mallalieu* (1948) 85 Cal.App.2d 77 [192 P.2d 24].)" (*Pittman v. Canham, supra,* 2 Cal.App.4th at pp. 559–560.)

Rather than being an aberration in the law as appellant argues, we conclude that *Pittman* is an aberration in the facts. In *Pittman*, the real estate broker/buyer prepared the contract, including a time is of the essence clause, and agreed to deposit the down payment, a deed of trust and a note within 30 days. He did not do so, and the seller treated the transaction as having been terminated without a sale. Buyer did nothing until five months later when the seller told him she had agreed to sell the property to someone else. (*Pittman v.*

*Canham, supra,* 2 Cal.App.4th pp. 558–559.) The court noted that there had been no impediment to the buyer's tender of performance. (*Id.* at p. 561.) In fact, all that was left for the parties to do was to exchange purchase money and a note for the deed within 30 days.

Even if we assume that time was of the essence to the parties in the case before us, we cannot conclude that the mutual obligations of the parties could be unilaterally extinguished because escrow was not able to close on January 14, 2000. This was not a situation in which the simple exchange of deed for consideration was involved. Rather, the escrows here required performance of a number of steps, some necessarily in a particular sequence, to permit the escrows to be in a position for the simultaneous final concurrent exchange of deed for consideration. As such, the facts here can be easily distinguished from those in *Pittman.* The evidence established without dispute that appellant had fulfilled its escrow and loan obligations and that the inability to fund was not due to anything appellant had failed to do. Indeed, the loans could not be funded nor could the escrows close on the scheduled closing date because Overseas failed to comply with its escrow obligations.

This case is more closely analogous to *Rubin v. Fuchs* (1969) 1 Cal.3d 50 [81 Cal.Rptr. 373, 459 P.2d 925], a case which the *Pittman* court distinguished. (*Pittman v. Canham, supra,* 2 Cal.App.4th p. 561.) In *Rubin,* a buyer of real property agreed to deposit cash and a purchase money deed of trust before the close of escrow, and the sellers agreed to subdivide the property and record a tract map before the closing date. Neither of the parties performed in accordance with these provisions. The court noted the rule that provisions of a contract will not be construed as conditions precedent in the absence of language plainly requiring such construction. (*Rubin v. Fuchs, supra,* 1 Cal.3d at p. 53.) However, the court found that because recordation of the tract map would supply the legal description for the deed of trust, the buyer's promise to execute the deed of trust was necessarily dependent upon the sellers' prior recordation of the tract map and therefore constituted a condition precedent. (*Id.* at p. 54.) Until the tract map was recorded, the parties were not in a position to deposit into escrow the instruments necessary to close the escrow. The court noted, however, that even if the parties' promises were deemed to be concurrent, it would not be reasonable to require the buyer to rely upon the sellers' mere assertions of ability to perform before depositing the purchase price. (*Id.* at p. 55.) "It follows that the [sellers] were not entitled to unilaterally rescind the contract because of [the buyer's] alleged breach in failing to deposit the full down payment into the escrow." (*Ibid.*)

 The deposit into escrow of the deed and other pertinent instruments necessary to complete the transaction by the seller, and the deposit into

escrow of the purchase price by the buyer are generally considered to be mutually dependent concurrent conditions, such that neither party is in default until one party performs or tenders performance. (1 Miller & Starr, Cal. Real Estate, *supra*, § 1:161, pp. 626, 627.) In *Hutton v. Gliksberg* (1982) 128 Cal.App.3d 240, 247 [180 Cal.Rptr. 141], the court upheld an award of specific performance in favor of the buyers to a real estate purchase contract, ruling that actual funding of the loan was not required to constitute a tender of the purchase price. Thus, where the evidence showed that the buyers timely performed all acts required on their part and the buyers' lender was prepared to deliver loan funds to escrow immediately upon request, the lender's loan commitment constituted the equivalent of cash for purposes of measuring performance by the buyers. As noted above, appellant does not contend that it performed or tendered performance, rather, that it was prevented from doing so by Overseas' breaches. (Civ. Code, § 1511, subd. (1) ["The want of performance of an obligation, . . . is excused [w]hen such performance or offer is prevented or delayed by the act of the creditor"].)

In *Stratton v. Tejani, supra,* 139 Cal.App.3d 204, the court affirmed the grant of specific performance in favor of the buyers in a real estate sales contract, finding that the buyers were excused from performing by the closing date by the actions of the sellers. The appellate court found that substantial evidence supported the finding that the sellers knew the buyers were salespersons and that one-half of the sales commission was to be credited to their account through escrow, and that the sellers' attempts to unilaterally amend the escrow instructions a few days before escrow was to close had the effect of depriving the buyers of almost 20 percent of the cash necessary for their down payment. (*Id.* at p. 211.) Accordingly, the appellate court found that the buyers acted reasonably in instructing the mortgage company to "hold up" the loan papers. (*Ibid.*) In *Taylor v. Sapritch* (1940) 38 Cal.App.2d 478 [101 P.2d 539], the court also held that the respondents' failure to turn over to escrow various trust deed documents "prevented appellant from performing his obligation, and in fact halted all further proceedings under the escrow." (*Id.* at p. 481.)

■ Similarly here, we conclude that the evidence established that Overseas' failure to timely comply with its escrow obligations prevented the escrows from closing and the loans from funding by the closing date when they otherwise would have.[11] Overseas' conduct therefore operated to excuse

---

[11] In its statement of decision, the trial court found that: "In the transactions at issue, there was a net cash shortfall between: [¶] a) on the one hand, the amount of proceeds to be paid to [Overseas] and the payoff of the existing encumbrances on the properties, and [¶] b) on the other hand, [appellant's] new loans from Washington Mutual Bank. That cash shortfall was to be made up by [appellant]." As stated above, Jen testified that he had the funds in January 2000 to make up this shortfall. There was no contrary evidence.

appellant's performance by the closing date. Accordingly, Overseas was not entitled to unilaterally rescind the parties' agreements.

## DISPOSITION

The judgment is reversed. The matter is remanded to the trial court for an entry of judgment for specific performance in favor of appellant. Appellant to recover its costs on appeal.

Boren, P. J., and Ashmann-Gerst, J., concurred.

A petition for a rehearing was denied December 30, 2003, and respondent's petition for review by the Supreme Court was denied March 24, 2004.