[Civ. No. 26549. Fourth Dist., Div. One. Nov. 24, 1982.]

JAMES W. STRATTON et al., Plaintiffs and Appellants, v.
NASIR TEJANI et al., Defendants and Appellants.

**COUNSEL**

L. Scott Karlin for Plaintiffs and Appellants.

Ronald D. Steinbach for Defendants and Appellants.

OPINION

**WIENER, Acting P. J.**—This controversy centers on the attempt by James W. and Patricia M. Stratton (Strattons) to buy the single family residence owned by Nasir and Sabira Tejani (Tejanis).[1] After the escrow between the parties failed to close on March 2, 1981, the Tejanis filed their complaint for unlawful detainer and for damages measured by the reasonable rental value of the residence for the period the Strattons remained in possession. The Strattons sued the Tejanis for specific performance and for incidental damages.

The Strattons prevailed in both actions which were consolidated for trial. The trial court ordered the Tejanis to complete the sale of the residence through the pending escrow within 60 days from notice of entry of judgment at the agreed price of $225,000 with the Strattons to pay interest on that sum at 16 percent per annum from March 2, 1981, until the close of escrow. The court also ordered the Strattons to pay the Tejanis rent at the reasonable monthly rate of $1,250 for the same period. Both parties have appealed. The Tejanis challenge the entire judgment. The Strattons complain only about the award of 16 percent interest on the purchase price and the failure of the court to award incidental damages for the higher interest payments they will have to make on their real estate loan as a result of the Tejanis' breach.

█ We affirm the judgments for specific performance and unlawful detainer.[2] █ We decide, however, the court erred in charging the Strattons with both rent and interest on the purchase price.[3] Established equitable principles require the parties be placed in the same positions they would have been in had the contract been timely performed. Accordingly, the Strattons are entitled to credit for rent less the reasonable value of their use of any retained purchase funds. The Tejanis, in turn, are entitled to interest on the entire purchase price less any sums the Strattons committed irrevocably and with notice towards the purchase price, but not in an amount exceeding the total rent. █ We also decide a buyer in a specific performance action is entitled to incidental damages for increased financing costs caused by the seller's breach. If after this appeal the interest rate on the Strattons' real estate loan is higher than it would have been had the escrow timely closed, the trial court shall have discretion to determine whether those damages are best calculated by (1) computing the difference between interest rates for the term of the loan for the time period the Strattons will reasonably occupy the residence and discounting that sum to its present cash value, (2) the difference in market value of the

---

[1]References to Stratton and Tejani in the singular will be to the respective husbands.

[2]Because of our affirmance of the specific performance judgment, we affirm the unlawful detainer judgment without discussion.

[3]In footnote 6 *post,* we discuss the effect of the Strattons remaining in possession of the premises without paying rent.

residence, if any, caused by the higher rate of interest, or (3) another method consistent with the guidelines outlined in this opinion.

## FACTS

The Tejanis bought the residence with a 10 percent cash down payment for about $154,000 on October 5, 1979. Ten days later they listed it at a substantially increased price through Michael Cantin (Cantin), a licensed real estate broker with Villa Associates, Inc. (Villa). Gora Bhaumik (Bhaumik), an undisclosed principal working with the Tejanis, was to split any profits from the resale. Stratton worked with Cantin in Villa's offices. The Strattons are both real estate salespersons.

On January 7, 1980, the Strattons agreed to lease the Tejanis' residence for one year at a monthly rental of $1048 with an option to purchase at $225,000. The Strattons paid $5,000 for the option which could be exercised any time between October 8, 1980, and January 7, 1981, by written notice and the deposit of an additional $4,000 into escrow. Escrow was to close 60 days after exercise of the option. The purchase price was to be funded by an 80 percent loan, $180,000, with the balance to consist of a credit for the $5,000 paid for the option, plus $40,000 cash through escrow. The agreement also required the Tejanis to pay Villa a $720 commission for obtaining the lease and a $13,500 commission upon consummation of the sale. Sometime after they signed the agreement, the Tejanis paid one-half of the $720 lease commission directly to the Strattons. Upon signing the agreement the Tejanis knew the Strattons were licensed real estate salespersons and that Cantin and Stratton had agreed to split the $13,500 sales commission.

The Strattons moved into the residence on January 7, 1980. They exercised their option to buy on December 30, 1980, and opened escrow at Burrow Escrow Company (Burrow). On January 6, 1981, they deposited $4,000 into escrow and signed escrow instructions which provided for a closing date of March 2, 1981. The Tejanis signed the instructions on or about January 21, 1981. On December 14, 1980, near the end of the lease period, the Tejanis raised the monthly rent to $1,400. Although the Strattons paid the increased rent from January 7, 1981, through March 2, 1981, they have paid nothing since that date.

Shortly after opening escrow the Strattons, through Verdugo Mortgage (Verdugo), began to search for funds to finance their purchase. Verdugo submitted the Stratton's application for a $180,000 loan to Pacific Federal Savings and Loan (Pacific) on February 24, 1981. Pacific's appraisal found the fair market value of the residence to be $275,000 as of February 9, 1981. Pacific approved the Strattons' application on March 5, 1981, three days after escrow was

scheduled to close. Pacific's approval was memorialized in writing and was subject to several conditions. Significant among those conditions was the Strattons' payment through escrow of an outstanding $7,800 automobile loan from another lender. The Strattons' loan from Pacific was to extend over 30 years at an annual interest rate of 17 percent. At the time of trial, the interest rate had increased to 17¾ percent. For reasons described below, Pacific never funded the Strattons' loan.

Burrow received conflicting instructions during escrow regarding payment of the $13,500 sales commission. On January 29, 1981, Villa instructed Burrow to credit one-half of the sales commission to the Strattons' escrow account. On February 27, 1981, the Tejanis' counsel instructed Burrow to cancel the portion of the instructions providing for payment of the sales commission to Villa. Burrow immediately notified Stratton of this new instruction. Stratton requested Verdugo to "hold up" on his loan application.

On March 2, 1981, Bhaumik personally delivered two letters to Burrow regarding the sales commission. One letter was from Bhaumik as president of United Investment Group (United), a real estate brokerage firm which had allegedly acquired Villa, instructing Burrow to pay the sales commission to United and asserting that neither Cantin nor Stratton was entitled to any portion of the commission. The other letter was from the Tejanis repeating their counsel's earlier instruction not to pay the sales commission to Villa and further instructing Burrow to pay the commission to United. The Tejanis' letter also instructed Burrow to cancel escrow if it did not close on March 2, 1981.

At the close of business on March 2, 1981, Burrow was unable to close escrow. The Strattons' loan documents and proceeds had not been deposited and the Tejanis had not filed a termite report as required by the escrow instructions.

## THE TEJANIS' APPEAL

■ The Tejanis contend they were entitled to cancel escrow on March 2, 1981, when the Strattons failed to timely perform in accordance with the escrow instructions. They claim that since their agreement made time of the essence, their attempts on February 27, 1981, and March 2, 1981, to amend the instructions regarding payment of the sales commission did not excuse performance by the Strattons. Although the trial court did not expressly rule on whether time was essential to the Strattons' and Tejanis' agreement, rejecting either the Tejanis' premise or conclusion defeats their argument.

Here, focusing primarily on whether the Strattons were excused from performance, the court found the Tejanis not only knew the Strattons were real estate

salespersons but also that one-half of the sales commission was to be credited to their account through escrow. The court concluded the Tejanis' effort to unilaterally amend the escrow instructions a few days before escrow was to close had the practical effect of depriving the Strattons of almost 20 percent of the cash necessary for their down payment. Because of this interference, the Strattons acted reasonably in telling Verdugo to "hold up" the loan papers. Substantial evidence supports the court's finding that the conduct by the Tejanis in impeding the Strattons' performance operated to excuse the latter's performance on March 2, 1981. (Civ. Code, § 1511; *Erich* v. *Granoff* (1980) 109 Cal.App.3d 920, 930 [167 Cal.Rptr. 538].)[4]

Moreover, the bargain itself did not contemplate time would be of the essence. Including "time is of the essence" in a document ". . . does not necessarily require a court to conclude that the buyer's rights would be so limited. (See, e.g., *Katemis* v. *Westerlind* (1953) 120 Cal.App.2d 537 [261 P.2d 553].)" (*Nash* v. *Superior Court* (1978) 86 Cal.App.3d 690, 696 [150 Cal.Rptr. 394], disapproved on another ground in *Malcolm* v. *Superior Court* (1981) 29 Cal.3d 518, 528, fn. 5 [174 Cal.Rptr. 694, 629 P.2d 495].) Here, similar to *Katemis,* the sales agreement gave the broker the absolute right to extend the closing date of escrow for a period not to exceed one month.[5] This provision is hardly consistent with time being crucial. Similar provisions in the escrow instructions also were insufficient to require performance by March 2, 1981. (See *Katemis* v. *Westerlind* (1953) 120 Cal.App.2d 537, 543-544 [261 P.2d 553].) Because time was not essential, the Strattons should have been given a reasonable time for performance. (Civ. Code, § 1657; *Weneda Corp.* v. *Dispalatro* (1964) 225 Cal.App.2d 187, 191 [37 Cal.Rptr. 267].)

On either ground the court's extending escrow to March 5, 1981, was correct. The Tejanis were therefore not entitled to cancel escrow when they attempted to do so three days earlier.

Although their duty to perform on the earlier date was excused, the Strattons still had to prove their ability to perform on March 5, 1981. (*Am-Cal Investment Co.* v. *Sharlyn Estates, Inc.* (1967) 255 Cal.App.2d 526, 539 [63 Cal.Rptr. 518]; see also *Ellis* v. *Mihelis* (1963) 60 Cal.2d 206, 215 [32 Cal.Rptr. 415, 384 P.2d 7]; Civ. Code, § 3386.) The Tejanis say there is insufficient evidence to support the court's finding the Strattons had the ability to perform on that date.

---

[4]Given our conclusion, we need not discuss the Tejanis' contention that their failure to timely file a termite report did not excuse the Strattons' performance on March 2, 1981. (See *Fogarty* v. *Saathoff* (1982) 128 Cal.App.3d 780, 785-787 [180 Cal.Rptr. 484].)

[5]Paragraph 8 of the sales agreement states: "Time is of the essence of this contract, but Broker may, without notice, extend for a period of not to exceed one month the time for the performance of any act hereunder, including the date of closing of Escrow (except the time for the acceptance of the offer by Seller)."

Contrary to the Tejanis' assertion, the facts establish that on March 5 the Strattons had received a firm loan commitment from a financially capable lender. (See *Am-Cal Investment Co.* v. *Sharlyn Estates, Inc.*, *supra*, 255 Cal.App.2d at pp. 539-540.) Furthermore, with approximately $44,600 in bank deposits, the Strattons had ample funds with which to pay the additional $36,000 for the down payment and the auto loan of $7,800. The court correctly determined the Strattons had the ability to perform on the extended date, for they were under no compulsion to prove their ability to perform at the time of trial. (*Id.*, at p. 545.)

## THE STRATTONS' APPEAL

In accordance with the judgment of specific performance, the Tejanis are entitled to receive the full performance of their contract with the Strattons. (*Ellis* v. *Mihelis*, *supra*, 60 Cal.2d at p. 215; *Simmons* v. *Dryer* (1963) 216 Cal.App.2d 733, 746 [31 Cal.Rptr. 199].) However, because execution of that judgment will occur at a date substantially after the date of performance provided by the contract, financial adjustments must be made to relate their performance back to the contract date. (*Ellis* v. *Mihelis*, *supra*, 60 Cal.2d at p. 220.) First, when a buyer is deprived of possession of the property pending resolution of the dispute and the seller receives rents and profits, the buyer is entitled to a credit against the purchase price for the rents and profits from the time the property should have been conveyed to him.[6] (*Heinlen* v. *Martin* (1879) 53 Cal. 321, 344-345; *Ellis* v. *Mihelis*, *supra*, 60 Cal.2d at pp. 219-220; *Meyer* v. *Benko* (1976) 55 Cal.App.3d 937, 946 [127 Cal.Rptr. 846].) "The concept of this monetary award to the buyer is *not* to give the buyer *damages* for the seller's breach of contract. Rather, it is designed to relate the performance back to the contract date of performance and to adjust the equities between the parties because of the delayed performance by the seller." (Miller & Starr, Current Law of Cal. Real Estate (1982 supp.) vol. 1, pt. 2, § 5:18, p. 52, italics in original.) Second, a seller also must be treated as if he had performed in a timely fashion and is entitled to receive the value of his lost use of the purchase money during the period performance was delayed. (*Ellis* v. *Mihelis*, *supra*, 60 Cal.2d at pp. 220-221; *Meyer* v. *Benko*, *supra*, 55 Cal.App.3d at pp. 946-947.) These adjustments are " 'more like an accounting between the parties than like an assessment of damages.' " (*D-K Investment Corp.* v. *Sutter* (1971) 19 Cal.App.3d 537, 549 [96 Cal.Rptr. 830] quoting from *Ellis* v. *Mihelis*, *supra*, 60 Cal.2d at p. 220.)

---

[6] For theoretical purposes, it is unnecessary to embellish on the wrinkle created by the Strattons remaining in possession. Their remaining in possession, however, does have a practical effect. The Strattons as "occupants" cannot obtain the benefit of rent-free premises while as owners get credit for this rent. In the accounting which must be rendered, the Strattons must first pay the rent for the premises before they receive appropriate credits.

There are, however, some limitations on these general rules. First, the buyer may not receive both the profits and reasonable rental value of the property and the value derived from his use of purchase funds which were not irrevocably allocated toward the purchase price. The buyer must reduce his credit for rents and profits by a sum equivalent to the value of his use of the retained purchase funds. (*D-K Investment Corp.* v. *Sutter, supra,* 19 Cal.App.3d at p. 549.) Second, if any part of the purchase price has been set aside by the buyer with notice to the seller, the seller may not receive credit for his lost use of those funds. (*Ellis* v. *Mihelis, supra,* 60 Cal.2d at p. 221.) Third, any award to the seller representing the value of his lost use of the purchase money cannot exceed the rents and profits awarded to the buyer, for otherwise the breaching seller would profit from his wrong. (*D-K Investment Corp.* v. *Sutter, supra,* 19 Cal.App.3d at p. 549; *Simmons* v. *Dryer, supra,* 216 Cal.App.2d at p. 746.)

■     Therefore, the trial court erred in charging the Strattons with both the reasonable monthly rental plus interest on the purchase price. The correct application of the foregoing rules requires the following: the Strattons should receive a credit against the purchase price for the reasonable rental value of the residence from March 5, 1981, until the close of escrow, less the reasonable value of their use of the $36,000 they did not deposit into escrow. The Tejanis are entitled to the reasonable value of their use of the entire purchase price less $9,000, the total of the option price and cash deposited into escrow, but not in an amount exceeding the total rent for the period performance was delayed.

In making these adjustments the trial court is not required to equate the reasonable value of the use of money with interest at the legal rate. Computing the value to the Strattons of their retained purchase funds and to the Tejanis of their lost purchase money should reflect the application of equitable considerations and not an award of legal damages. The proper yield on these sums can best be determined by the trial court in an evidentiary hearing in which each party can present evidence on the rate of interest paid by the Tejanis to maintain the trust deeds on the residence during the delay period, the Strattons' use of their retained purchase funds during this same period and the types of investments available to both parties for that period. Obviously, we cannot anticipate all the evidence the parties may seek to introduce on this issue. We defer to the trial court for the proper exercise of discretion in permitting the introduction of relevant evidence which will result in an equitable accounting for the intervening events during the period performance was delayed. (See *Greenstone* v. *Claretian Theo. Seminary* (1959) 173 Cal.App.2d 21, 29 [343 P.2d 161], disapproved on another ground in *Ellis* v. *Mihelis, supra,* 60 Cal.2d at p. 221.)[7]

---

[7]For whatever benefit it may be to the trial court upon remand, we wish to advise that in using various hypotheticals including different yields on the use of money during the subject period,

In addition to the accounting the parties must make to equitably adjust their offsetting claims, the Strattons claim they are also entitled to interest differential damages because they will now be obligated to pay interest on their 30-year real estate loan at a higher rate than they would have had to pay had escrow timely closed.

Obviously, one way of resolving this claim is to presume mortgage loan rates will be lower when this case is finally resolved than they were on March 5, 1981. Another solution is to dismiss this issue summarily as presenting a problem so complex that any effort to determine the damages which might possibly flow from the vagaries of the financing market is too speculative. (See *Erich* v. *Granoff, supra,* 109 Cal.App.3d at p. 932; see also Miller & Starr, *supra,* pp. 53-54.) We are reluctant to accept either approach for we believe a court must acknowledge the economic reality that if a seller's breach causes a buyer to pay interest on a real estate loan higher than the rate initially bargained for, then that buyer sustains damages for each dollar unnecessarily expended. Under such circumstances, the hard question is not whether there are damages, but the correct method to determine that sum so as to make the buyer whole.

Here, if the trial court determines the Strattons' financing costs will be higher after this appeal than they would have been had escrow closed on March 5, 1981, the court must determine the amount of that increase and award damages accordingly. In *Hutton* v. *Gliksberg* (1982) 128 Cal.App.3d 240 [180 Cal.Rptr. 141] such damages were computed by calculating the difference over the full term of the buyer's loan between interest rates at the time the contract should have been performed and at the time of trial and then discounting that amount to its present cash value. *Hutton* approved a $122,000 damage award for the present cash value of the interest difference between a 14 percent and a 9¼ percent loan of $400,000 extending over 30 years. In our view, however, this approach lacks an underlying factual basis. Residential real property typically is held for only seven to ten years. (See Miller & Starr, *supra,* p. 54.) If, in this case, the Strattons sell the residence shortly after escrow closes, interest differential damages calculated under the *Hutton* formula would amount to a windfall if that differential does not cause them to sell at a reduced price. Accordingly, we believe a preferable solution is to require the trial court to determine factually how long the Strattons will remain in possession. As real estate licensees did they buy the property for investment purposes and now intend to market it within the next year or so? Or, in light of personal circumstances, do they intend to retain it as their permanent residence for the duration of their loan? The

---

we invariably end up with the Tejanis being entitled to $15,000 in addition to the purchase price. The reason for this is quite simple. The rent charged against the Strattons as occupants and credited to their account as owners is a wash. Since the yield on the purchase price less $9,000 exceeds the reasonable rental value of the premises, the Tejanis are limited to that sum, $15,000.

resolution of this question is no more onerous than fact determinations in other types of cases. Once answered, the present cash value for the interest differential should be award for the Strattons' anticipated time of possession rather than for the life of their loan.[8]

If, however, the trial court is unable to factually resolve this question, other solutions are available. For example, on the basis of evidence presented the court may be able to isolate the difference in market value, if any, caused by the residence bearing a real estate loan at a higher rate of interest. This sum would then be a credit in favor of the Strattons against the purchase price through escrow. (Miller & Starr, *supra,* p. 54.) In any event, we leave it to the discretion of the trial court to select a method of calculating interest differential damages, if any, consistent with the guidelines outlined in this opinion.

### DISPOSITION

The judgment charging the Strattons with rent and denying them interest differential damages is reversed. The matter is remanded for further proceedings consistent with this opinion. In all other respects, the judgment is affirmed. The parties shall bear their own costs for this appeal.

Work, J., and Moon, J.,* concurred.

Petitions for a rehearing were denied December 23, 1982.

---

[8]We use the word "possession" in a very general sense because evidence may be presented at the hearing on the probability of interest rates declining after the close of escrow, thus enabling the Strattons at a future time to refinance their property at a lower rate. If sufficient evidence is presented on this issue, possession by the Strattons becomes irrelevant. The relevant period selected would terminate not with a change of possession but when a more favorable interest rate becomes commercially available.

*Assigned by the Chairperson of the Judicial Council.