Filed 8/1/16  Harbor Marina v. Golden Hills Properties CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| HARBOR MARINA, LLC, | |
| Plaintiff and Appellant, | G051955 |
| v. | (Super. Ct. No. 30-2014-00706930) |
| GOLDEN HILLS PROPERTIES, LLC, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Randall J. Sherman, Judge.  Reversed and remanded with directions.

Loeb & Loeb, Andrew S. Clare and Robert J. Catalano for Plaintiff and Appellant.

Steckbauer Weinhart, William W. Steckbauer and Sean A. Topp for Defendant and Respondent.

\*          \*          \*

This dispute arises out of a ground lease of commercial property developed into an office building and marina in Newport Beach. Defendant and respondent Golden Hills Properties, LLC (Defendant) is the ground lessor. Plaintiff and appellant Harbor Marina, LLC (Plaintiff) is the ground lessee.

Defendant exercised an option to purchase Plaintiff's leasehold interest. The lease provided the purchase price was to equal the fair market value of the leasehold interest, based upon the present value of the projected net operating revenue to be generated during the remaining lease term.

Defendant refused to pay the purchase price unless it received an offset for the amount of net operating revenue Plaintiff earned after the purchase option was exercised but before the purchase and sale transaction closed. Litigation ensued.

The court found the valuation provision of the lease was ambiguous, and while nothing in the lease required it, the court ordered Plaintiff to pay Defendant the amount of net operating revenue it earned before the purchase and sale transaction closed.

Plaintiff appealed, arguing the valuation provision of the lease is not ambiguous and the court erred by ordering Plaintiff to pay that amount to Defendant. We agree, reverse the judgment, and remand with directions to correct the error.

## FACTS AND PROCEDURAL HISTORY

The parties' predecessors in interest, County of Orange as lessor and Thomas A. Cox as lessee, entered into the ground lease (Lease) in 1964. Later, Plaintiff exercised an option (Extension Option) which extended the Lease term through 2018.

An amendment (Amendment) to the Lease gave the lessor an option (Purchase Option) to purchase the lessee's leasehold interest during the last five years of the extended Lease term. Paragraph 11(c) (Paragraph 11(c)) of the Amendment stated: "During the last five years of the [Extension] Option period, [Defendant] shall have the option to purchase [Plaintiff's] leasehold estate and improvements at the fair market value existing on the date such [Purchase Option] is exercised."

2

The fair market value was to be determined by an appraisal. Paragraph 11(c) provided: "Fair market value for this purpose means the cash price a willing purchaser would pay and a willing seller would accept for the leasehold estate and improvements in an arms-length transaction in which the parties have comparable bargaining positions, calculated on the basis of the then present value of all net operating revenues (before debt service) projected to be realized by [Plaintiff] from the date the [Purchase Option] is exercised to the expiration date of the [Extension Option] period."

The purchase and sale transaction was to close on the later to occur of: (a) 90 days after the Purchase Option was exercised, or (b) 30 days after the Purchase Option was exercised and the fair market value was determined.

Defendant exercised the Purchase Option in 2013. Eventually, the appraisers determined the fair market value was $5,065,000 (Purchase Price).

Plaintiff then asked Defendant to pay the Purchase Price and deliver any security deposits Defendant held under the Lease. Plaintiff offered to deliver any security deposits Plaintiff held as landlord under various subleases.

Defendant said it would pay the Purchase Price, only if Plaintiff would pay all "appropriate operating revenues (before debt service) as determined by the appraisers in accordance with the Lease which were collected by" Plaintiff from the date Defendant exercised the Purchase Option until the transaction closing date "and which were utilized by the appraisers in determining the fair market value" (Interim Operating Revenue). Defendant stated, that is "precisely the result that any reasonable person would agree to pay and to receive under the Lease." Defendant demanded Interim Operating Revenue in the amount of $1,165,672, plus rent collected for July and August 2014.

Plaintiff sued Defendant for breach of contract for failure to pay the Purchase Price. Plaintiff sought specific performance or, alternatively, damages. Defendant's cross-complaint for breach of contract and declaratory relief sought a declaration Plaintiff was required to pay Defendant the Interim Operating Revenue.

After a bench trial the court ruled in favor of Defendant. The court said there was only one issue, i.e., should there be an offset against the Purchase Price for the Interim Operating Revenue. The court ruled the Amendment governed but found it was ambiguous "and the reason for that is that the clause provides that [Defendant] shall have the option to purchase [Plaintiff's] leasehold estate and improvements at the fair market value existing on the date such [Purchase Option] is exercised."

The court went on, "Well, if you're buying a leasehold estate and improvements, then you're buying the right to receive rent, and if the purchase price is to include the income stream from [the date the Purchase Option is exercised until the end of the Lease term], and that's the amount the buyer is paying, then the buyer should receive the income stream [for that period of time]."

The court further stated, "Although Paragraph 11(c) doesn't say that the plaintiff pays the defendant those collected rent monies, it doesn't say that they don't pay them over; hence, an ambiguity. [¶] So the court looks to what seems to be a logical interpretation of this provision, which is that if the price is based on x, y and z being valued, you should get x, y, and z. If you're paying for it, you should get it. That's a pretty straightforward concept, I believe."

The court ordered specific performance, and the judgment required Plaintiff to pay Defendant the Interim Operating Revenue. After adjusting the Purchase Price for that payment and adding prejudgment interest, the net purchase price was $3,212.815.

## DISCUSSION

*1. Standard of Review and General Principles of Contract Interpretation*

We review a trial court's construction of a lease de novo as long as no conflicting extrinsic evidence was admitted to assist in determining the meaning of the language. (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266-1267, 1268 (*ASP*).) In so doing we rely on general principles of contract interpretation.

4

Our main task is to determine the mutual intent of the parties at the time the contract was formed.  (*ASP*, *supra*, 133 Cal.App.4th at p. 1269; Civ. Code, § 1636; all further statutory references are to this code unless otherwise stated.)  "'"'Such intent is to be inferred, if possible, solely from the written provisions of the contract.  [§ 1639.]  The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' . . . controls judicial interpretation.  [§ 1638.]"  [Citations.] . . . [L]anguage in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract.  [Citation.]  Courts will not strain to create an ambiguity where none exists.  [Citation.]'  [Citation.]  Interpretation of a contract 'must be fair and reasonable, not leading to absurd conclusions.  [Citation.]'  [Citation.]  'The court must avoid an interpretation which will make a contract extraordinary, harsh, unjust, or inequitable.  [Citation.]'  [Citation.]"  (*ASP* at p. 1269.)

Although there was testimony from the parties' representatives and experts, neither that testimony nor other extrinsic evidence was probative regarding the intent of the original lessor or original lessee.  For example, the property manager testified that in exercising the Purchase Option, Defendant "expected" Plaintiff would pay Defendant all of the net revenues Plaintiff had collected after the Purchase Option was exercised.  But Defendant's expectations are not evidence of the original parties intent.

Similarly, Defendant's valuation expert testified the appraisers correctly determined the Purchase Price by "discounting to present value the cash flow that the interest produces," and Defendant was "purchasing the value of the cash flows" through the remainder of the Lease term, which was the value of the interest.  This testimony was no more than the expert's opinion as to how the appraisal should be conducted, and expert opinion as to the meaning of a lease is irrelevant.  (*In re Tobacco Cases I* (2010) 186 Cal.App.4th 42, 51 ["the interpretation of contractual language is a legal matter for the court . . .and '[e]xpert opinion on contract interpretation is usually inadmissible'"].)

Thus we look only to the provisions of the Lease to determine its meaning.

5

*2. Erroneous Interpretation of Paragraph 11(c)*

Even though both parties argued Paragraph 11(c) was not ambiguous, the court found it was ambiguous because it did not mention the Interim Operating Revenue. The court reasoned Paragraph 11(c) gave Defendant the option to purchase Plaintiff's leasehold interest and improvements, including the right to receive the Interim Operating Revenue. Again the court explained, "Well, if you're buying a leasehold estate and improvements, then you're buying the right to receive rent, and if the purchase price is to include the income stream from [the date the Purchase Option is exercised until the end of the Lease term], and that's the amount the buyer is paying, then the buyer should receive the income stream [for that period of time]." Thus, the court concluded if Defendant was paying for the Interim Operating Revenue, Defendant should receive it.

The court correctly observed Paragraph 11(c) did not address Interim Operating Revenue, but incorrectly concluded Defendant was purchasing the Interim Operating Revenue. The plain language belies this construction. Again the fair market value, is "calculated on the basis of the then present value of all net operating revenues (before debt service) projected to be realized by [Plaintiff] from the date the [Purchase Option] is exercised to the expiration date of the [Lease under the Extension O]ption."

Hence, the "present value of all net operating revenues" was just the method by which the value of the leasehold was to be calculated, it was not what was being sold. What was being sold was the leasehold interest and the improvements. (See *Howard v. County of Amador* (1990) 220 Cal.App.3d 962, 973-974 ["A leasehold estate transfers a present interest to the lessee which includes the beneficial use of the property"].) In sum, Defendant was not purchasing the Interim Operating Revenue itself.

Defendant points out that at the end of the Lease term, the marina and other improvements will have no value, because the marina will revert to the City of Newport Beach and the other improvements will revert to Defendant. This is true. But Defendant willingly exercised the Purchase Option knowing that. It was not forced to do so.

6

Further, the court erred by concluding the Lease was ambiguous simply because it said nothing about what was to happen to the Interim Operating Revenue when the purchase and sale transaction closed. First, the failure to mention something does not necessarily create an ambiguity. (See *Cain v. Hunter* (1958) 161 Cal.App.2d 808, 812 [where no provision allowing interest on deferred payments in contract, no interest could be charged; no ambiguity in contract due to omission of provision].)

Second, pursuant to the Lease Plaintiff had the right to collect rent from its tenants and concessionaires and the duty to pay Defendant a percentage thereof, until the purchase and sale transaction closed. A seller retains all rights of ownership until the property is actually transferred, unless the purchase and sale contract provides otherwise. So Plaintiff was entitled to keep the pre-closing rents it collected. No special provision in Paragraph 11(c) was necessary to address the Interim Operating Revenue.

Defendant argues any buyer would "without a doubt," expect to receive all rental income, including the Interim Operating Revenue. It quotes testimony of one of the appraisers that the fair market value of the leasehold was to be calculated using a discounted cash flow analysis, which he stated was consistent with the appraisal method set out in Paragraph 11(c). He also testified the discounted cash flow analysis projected "net income that is reasonably anticipated to be received on a forward looking basis calculating what those cash flows will be going into the future." Nothing in this testimony supports the conclusion the Lease required Plaintiff to pay Defendant the Interim Operating Revenue.

Likewise, the testimony of Defendant's expert that the value of the leasehold interest is determined by discounting the cash flow to present value does not mean Defendant is entitled to receive the Interim Operating Revenue.[1]

---

[1] The other expert testimony on which defendant relies, that Defendant was "purchasing the value of the cash flows for that specific period," was stricken by the court.

In any event, as noted above, no expert testimony as to the meaning of Paragraph 11(c) is relevant as it is the court's function to determine that meaning.

Defendant also argues Plaintiff's interpretation of the Lease is not "'fair'" and is unjust. In this regard Defendant seems to erroneously conflate the meaning of "fair market value" as defined in the Lease with what is "fair" in some larger sense.

But the law is clear and well settled that the court has neither the duty nor the authority to rewrite a lease merely because the terms might be unfair. "Our task is to construe the . . . lease[] as [it is], not as [Defendant] want[s it] to be. 'We do not have the power to create for the parties a contract that they did not make and cannot insert language that one party now wishes were there.' [Citation.]" (*Abers v. Rounsavell* (2010) 189 Cal.App.4th 348, 361-362.) "[C]ourts assume that each party to a contract is alert to, and able to protect, his or her own best interests. [Citations.] Therefore, courts will not rewrite contracts to relieve parties from bad deals nor make better deals for parties than they negotiated for themselves. [Citation.]" (*Series AGI West Linn of Appian Group Investors DE, LLC v. Eves* (2013) 217 Cal.App.4th 156, 164.) "In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted . . . ." (Code Civ. Proc., § 1858.)

On the other hand, Defendant's interpretation of the Lease would lead to an unjust result for Plaintiff. The language of Paragraph 11(c) sets out the terms of the deal the parties made. It must be enforced according to those terms.

We reject Defendant's argument Plaintiff failed to prove its request for specific performance of the terms of the Purchase Option. Citing *Boulenger v. Morison* (1928) 88 Cal.App. 664, 669, Defendant contends Plaintiff did not prove an element of specific performance, i.e., that the Lease was "just and reasonable, and the consideration adequate." As noted above, there is nothing unfair or unreasonable about the terms of Paragraph 11(c). The consideration to be paid was agreed upon. Plaintiff met its burden.

8

*3. No Gift of Public Funds*

Defendant claims Plaintiff's interpretation of the Lease cannot be correct because the original lessor, the County of Orange, would have illegally been gifting the Interim Operating Revenue being purchased, in violation of the prohibition against gifting public funds. (Cal. Const., art. XVI, § 6.) This argument has no merit. Since Defendant was not purchasing the Interim Operating Revenue, there was no such gift.

*4. Specific Performance Directions*

On remand the court shall enter a judgment in favor of Plaintiff ordering specific performance of the purchase and sale. The court must determine and allocate income and expenses to place the parties in the same position they would have been in if the transaction had closed on date specified in the Lease. (*Stratton v. Tejani* (1982) 139 Cal.App.3d 204, 212.) "[B]ecause execution of that judgment will occur at a date substantially after the date of performance provided by the [Lease], financial adjustments must be made to relate their performance back to the [Closing Date]." (*Ibid*.)

The court shall calculate the date on which the transaction should have closed (Closing Date) based upon Paragraph 11(c) [transaction to close by the latter of "90 days after the option to purchase is exercised or . . . 30 days after the option to purchase is exercised and the purchase price finally determined"].

As provided in Paragraph 11(c), Defendant shall pay the Purchase Price to Plaintiff in cash and return to Plaintiff "all unexpended security deposits made under the Lease," and Plaintiff shall deliver to Defendant "all unexpended security deposits received from subtenants, concessionaires, operators and licensees." Plaintiff shall also deliver to Defendant all net operating revenues (before debt service) realized by Plaintiff after the Closing Date.

The Purchase Price and the security deposits shall bear interest from the Closing Date, and the net operating revenues shall bear interest from the date earned, in each case at the legal rate until the date upon which the judgment is entered.

9

## DISPOSITION

The judgment is reversed and remanded. The trial court is to enter a new judgment in accordance with this opinion. Plaintiff is entitled to costs on appeal.


THOMPSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


IKOLA, J.