Filed 3/15/18

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| PETROLINK, INC., | D073012 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. CIVVS1200383) |
| LANTEL ENTERPRISES, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Brian S. McCarville, Judge. Reversed in part.

Bleau Fox, Martin R. Fox and Megan A. Childress for Plaintiff and Appellant.

Fullerton, Lemann, Schaefer & Dominick, Wilfrid C. Lemann and David P. Colella for Defendant and Respondent.

I.

INTRODUCTION

In this appeal, plaintiff Petrolink, Inc. (Petrolink) seeks a modification of a judgment entered in its favor on its cause of action for specific performance. Petrolink leased a parcel of undeveloped property from defendant Lantel Enterprises (Lantel),

pursuant to a lease agreement that included a provision allowing the lessee to purchase the property at the fair market value of the property according to an appraisal. Petrolink notified Lantel of its desire to exercise the purchase option, but the parties obtained appraisals that were far apart in their valuation of the property. The parties ultimately could not agree on the fair market value of the property.

The parties sued each other, each asserting various causes of action, including specific performance, claiming that the other party had refused to complete the sale and purchase transaction, and essentially seeking a judicial determination as to the fair market value of the property. During the pendency of the litigation, Petrolink continued to pay Lantel monthly rent on the property.

The case went to trial before a judge. At trial, Lantel did not dispute that Petrolink had exercised the purchase option. Instead, Lantel's main contentions at trial were that (1) the option in the lease could not be enforced because it was insufficiently certain since it did not contain a purchase price, and (2) if the option was enforceable, Lantel should be the party to obtain the appraisal and set the sale price. The main factual issue at trial concerned what the fair market value of the property was at the time Petrolink notified Lantel of its desire to purchase the property. The judge appointed an expert and obtained an independent appraisal of the property, which, not surprisingly, was between the values in the appraisals that the parties had obtained. The trial court ultimately entered judgment in favor of Petrolink on its specific performance cause of action and made a finding that the date on which Petrolink exercised the purchase option was August 25, 2011, the date of its letter notifying Lantel of its desire to exercise the

2

purchase option. The court ordered Lantel to sell the property to Petrolink for $889,854.00, which is what the court determined the fair market value of the property was as of August 25, 2011. Although Petrolink had requested an offset against the purchase price for the value of the rents it had paid after exercising the purchase option, the court did not grant Petrolink an offset for any of the rent that it had paid to Lantel during the pendency of the litigation.

On appeal, Petrolink contends that the trial court erred in failing to offset the rents it paid to Lantel through the pendency of this litigation against the purchase price. According to Petrolink, once it validly exercised the option to purchase the property, a contract for purchase and sale was created, and the lease between the parties was extinguished, such that no further rents were due or owing to Lantel. In response, Lantel asserts that Petrolink never provided an unconditional acceptance of the terms of the purchase option☐a position that it did not take in the trial court☐and therefore, did not validly exercise the purchase option. Lantel also argues that the fact that Petrolink continued to pay rent reflects the parties' understanding that rent would remain due during the pendency of any litigation, and further argues that the trial court did not provide Petrolink with an offset because the court weighed the equities and determined that Petrolink was not entitled to an offset for the rents that it paid to Lantel.

Given the court's finding that Petrolink validly exercised the purchase option on August 25, 2011, and given that Lantel has not challenged this determination, which underpins the entire judgment of specific performance in favor of Petrolink, through a cross-appeal, that portion of the court's judgment is established. We therefore agree with

3

Petrolink that once it exercised the purchase option, the lease was terminated and a contract for purchase and sale came into existence. To the extent that the trial court denied Petrolink an offset for the rents that it paid during the pendency of the litigation, the court failed to account for the delayed performance of the contract for purchase and sale. Specifically, the court failed to place the parties in the positions in which they would have been at the time the sale and purchase contract should have been performed.

We therefore reverse the judgment to permit the trial court to undertake an accounting between the parties, in a manner consistent with the discussion that follows. The accounting shall take into account the delay in performance of the contract and must place both parties in the positions in which they would have been if the contract had been timely performed.[1]

II.

FACTUAL AND PROCEDURAL BACKGROUND

The parties were signatories to a lease that was originally entered into by Lantel and Tosco Corporation in 1998. The lease pertained to a parcel of land near an interchange between Interstate 15 and Highway 138 in San Bernardino County. Petrolink eventually obtained a leasehold interest through various assignments to different entities.

---

[1] We also direct the court to determine when, after Petrolink validly exercised the purchase option in the lease, the resulting contract for purchase and sale reasonably should have been performed.

The lease contained a provision granting the tenant the right to purchase the property at any time, for fair market value, after an initial 10-year term had elapsed. The specific language of the purchase option provision is as follows:

> "21. RIGHT TO PURCHASE. As long as the Tenant is not in default of this Agreement, Tenant will have an option to purchase the property at any time after the first Ten (10) years of the lease term at a price equal to the fair market value of the property based on an appraisal."

On August 25, 2011, Petrolink mailed a letter to Lantel indicating its desire to exercise the purchase option in the lease, and asking Lantel to provide it with an appraisal regarding what Lantel believed to be the fair market value of the property.[2] According to the trial testimony of one of Lantel's principals, Lantel understood Petrolink's August 25, 2011 letter to be an exercise of its option to purchase the subject property.

Lantel hired an appraiser to determine the fair market value of the property. Lantel's appraiser concluded that the fair market value of the property was $1,615,000. Based on the appraisal, Lantel offered to sell Petrolink the property for $1,615,000.

In response, Petrolink offered to purchase the property for $320,000, based on an appraisal that Petrolink had separately commissioned. Lantel did not respond to Petrolink's offer of $320,000. Petrolink sent another letter to Lantel, this time offering to purchase the property for "roughly" $486,000.

In a letter dated October 25, 2011, Petrolink proposed that the parties obtain a third appraisal of the property in order to determine the fair market value. Lantel did not

---

[2] The lease provided that "[a]ny notice required or permitted to be given to any party shall be in writing and shall be delivered . . . by first class mail."

5

respond to Petrolink's proposal that the parties share the cost of obtaining a third appraisal.

On January 24, 2012, Petrolink sued Lantel for, among other things, specific performance, asserting that it had exercised its option to purchase the property and had agreed to purchase it at a price equal to the fair market value of the property based on an appraisal, and that it had offered to tender the value established by its own appraisal—i.e., $320,000.00. Lantel filed a cross-complaint, alleging breach of contract and breach of the covenant of good faith and fair dealing with respect to the lease, and a claim for specific performance, arguing that Petrolink was the breaching party or the party that wrongfully refused to consummate the sales transaction for the property. Lantel alleged that Petrolink had "provided notice to [Lantel] that it was exercising its right to purchase Parcel 1 pursuant to Section 21 of the Lease," and that Lantel was "willing, ready, and able to perform all conditions, covenants, obligations and promises required of it under the Lease, including selling" the property to Petrolink for the value established by Lantel's appraisal—i.e., $ 1,615,000.00.

A bench trial began on September 14, 2015. At trial, both of the appraisers that had been hired by the parties testified, as did an independent appraiser whom the trial court had appointed as a court expert pursuant to Evidence Code section 730. The court's expert was asked to provide his conclusion regarding the fair market value of the property as of August 25, 2011. The court's expert estimated that the value of the property as of August 25, 2011 was $789,000.00. He also testified that if a third party, rather than the tenant, was seeking to purchase the property, there would be "bonus rent," which he

6

considered to be the difference between fair market rent and the rent due under the lease, of $3,735.00 per month. Petrolink's appraiser testified regarding his appraisal and analysis of the value of the property, which he had determined as of March 29, 2011. Lantel's appraiser provided his appraisal and analysis of the value of the property as of October 8, 2011.

At the close of evidence and pursuant to the court's suggestion, the parties agreed to a closing argument briefing schedule and submission of "proposed statements of intended decision."

In closing argument, Petrolink argued that it was entitled to a judgment that included an offset for the rents it had paid to Lantel, such that whatever purchase price the court ultimately determined was the fair market value "should be reduced by what Petrolink has paid in rent from 30 days following the exercise of the purchase price[3] up until today."[4]

Lantel argued in closing that the "right to purchase" option in the lease was ambiguous, and that extrinsic evidence was therefore admissible to establish that the intent of the provision was that Lantel's appraisal be determinative as to fair market

---

[3] It would appear that counsel intended to refer to the exercise of the purchase "option" not "price."

[4] The suggestion of a 30-day period after the exercise of the purchase option appears to represent what would be a reasonable escrow period to allow the parties to effectuate the sale transaction and transfer title to Petrolink. According to Petrolink's closing argument brief, Petrolink was entitled to all rent that it had paid to Lantel after September 24, 2011. In other words, Petrolink argued that the purchase and sale contract should have been performed as of September 24, 2011, and that it was therefore entitled to specific performance as of that date.

7

value.  Lantel also argued that if its appraisal was not determinative of fair market value, at a minimum, the court must consider the value of the lease between Lantel and Petrolink in determining the fair market value—an item that Petrolink's appraiser had not included in his analysis.  In addition, Lantel contended that if the court were to rely on the court's appointed expert's appraisal, the value of the property should be $789,000 for the base value of the property, plus an additional $100,845.00 in " 'bonus rent,' " for a total value of $889,845.00 as of August 25, 2011.  Lantel did not contend that Petrolink had not validly exercised the purchase option under the lease.[5]

After considering the parties' closing argument briefs and hearing argument from counsel, the trial court issued a "Statement of Intended Decision" (some capitalization omitted).  The court indicated that it intended to find in favor of Petrolink on its specific performance cause of action, and that it found the fair market value of the property "as of August 25, 2011 to be $889,854.00."[6]  The court further concluded that "no offsets for

[5]    As these arguments demonstrate, at this point, Lantel was not disputing either the validity of the August 25, 2011 letter that Petrolink submitted as evidence of its exercise of the purchase option, or whether the letter was sufficient to constitute a valid exercise of the purchase option.

[6]    In concluding that $889,854.00 was the fair market value of the property in August 2011, the trial court was persuaded by Lantel's argument that the fair market value would be the value of the property to the market—i.e., to third parties, and not simply to the lessee—and that therefore, the fair market value should include the value of the " 'bonus rent' " that the court's expert appraiser discussed.

However, it appears that there was a computational error in the court's determination that the fair market value was $889,854.00.  The court's "Statement of Intended Decision" states that the appraisal value was $789,000.00, and that the " 'bonus rent' " was $100,845.00.  Those two values added together result in a total of $889,845.00, however, the court's "Statement of Intended Decision" sets the total value at $889,854.00.  This computational error was repeated in the judgment.

8

any rents paid will be allowed." The court stated, "Petrolink's request for an offset as to rents paid is without merit. Petrolink was required to continue to pay rent until all the provisions of (¶21) had been met. Since the parties could not agree on the fair market value it was for the court to decide. Hence the final requirement for (¶21) is this court's order fixing the fair market value at $889.854.00."

In the judgment, the court found that "[o]n August 25, 2011, Petrolink timely exercised its option to purchase the Property agreeing to pay the fair market value of the property based upon appraisal." The court also found that Petrolink had never been in default under the Lease. The court determined that Petrolink was entitled to recover against Lantel on its specific performance cause of action, but denied relief as to its claims for breach of contract and breach of the implied covenant of good faith and fair dealing. The court further concluded that "Petrolink is not entitled to a set-off of any of these [$396,750.00 in rent] payments against the purchase price."

The court determined that Lantel was to convey the property to Petrolink by grant deed, free and clear of all encumbrances, upon the receipt of $889,854.00.

Petrolink filed a timely notice of appeal. Lantel did not appeal from the judgment.

III.

DISCUSSION

On appeal, Petrolink contends that it was entitled to an offset for the rents that it paid to Lantel after it exercised its purchase option under the lease and during the pendency of this litigation. According to Petrolink, upon its valid exercise of the

9

purchase option, the lease was transformed into a *contract of sale*, thereby extinguishing any landlord-tenant relationship, as well as any right the landlord had to further rent.

Lantel contends on appeal that Petrolink's August 25, 2011 notice was not an unconditional acceptance of the terms of the purchase option, and therefore, does not constitute a valid exercise of the option. Lantel also argues that by continuing to pay rent, Petrolink was simply acting according to the understanding of the parties that rent would remain owing as long as Petrolink continued to possess the property during the pendency of any lawsuit. Finally, Lantel contends that "equity does not support [Petrolink's] claim [for an offset to the purchase price]."

We conclude that Petrolink has the better position.

"An option may be viewed as a continuing, irrevocable offer to sell property to an optionee within the time constraints of the option contract and at the price set forth therein. It is, in other words, a unilateral contract under which the optionee, for consideration he has given, receives from the optionor the right and the power to create a contract of purchase during the life of the option. 'An irrevocable option is a *contract*, made for consideration, to keep an offer open for a prescribed period.' (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 126). An option is transformed into a contract of purchase and sale when there is an unconditional, unqualified acceptance by the optionee of the offer in harmony with the terms of the option and within the time span of the option contract. [Citation.]" (*Erich v. Granoff* (1980) 109 Cal.App.3d 920, 927–928 (*Erich*).) " ' "The 'exercise' of an option is merely the election of the optionee to purchase the property." ' " (*Peebler v. Seawell* (1954) 122 Cal.App.2d 503, 506

10

(*Peebler*), citations omitted.)  Importantly, "the exercise of an option . . . results in a contract of purchase and sale."  (*Erich*, *supra*, 109 Cal.App.3d at p. 927.)

Where an option to purchase exists within a lease agreement, the exercise of the option to purchase causes the lease and its incorporated option agreement to cease to exist, and, instead, " ' "a binding contract o[f] purchase and sale c[omes] into existence between the parties.  [Citations.]" ' "  (*Peebler*, *supra*, 122 Cal.App.2d at p. 506; see also *Sacks v. Hayes* (1956) 146 Cal.App.2d Supp. 885, 887 (*Sacks*) ["[W]hen defendant exercised the option granted her to purchase the property by making the first payment of $500 thereunder, the lease and option agreement no longer existed and a binding contract of purchase and sale came into existence between the parties"].)  Further, a consequence of the termination of the lease agreement is that the former lessee's obligation to pay rent under the lease also terminates, unless there is an express stipulation that requires continued rent payments after the exercise of the purchase option.  (*Sacks*, *supra*, at pp. 887–888, citations omitted; *Erich*, *supra*, 109 Cal.App.3d 920 [purchase option provision in lease did not require tender of purchase price for exercise of the purchase option, and notification of exercise was sufficient to terminate obligation to pay rent as of the date that the sale would have closed, but for the lessor's lack of cooperation].)  " 'Where the relation of landlord and tenant exists under the terms of a written lease, containing an option to purchase which the lessee exercises, he is no longer in possession as a tenant, but his possession is that of a vendee.' "  (*Sacks*, at pp. 887–888; see also 52A C.J.S. Landlord & Tenant, § 1134 ["The tenant may be relieved of liability for rent where he or she has exercised an option granted in the lease to purchase the land.  [Footnote omitted.]

11

The landlord ordinarily is not entitled to recover for rent from the date when the tenant sought to exercise an option to purchase where the landlord prevented effective exercise of the option"].)

As is clear from the judgment, the trial court found that Petrolink validly exercised its option to purchase the property as of its notice, which was dated August 25, 2011. Although Lantel argues on appeal that Petrolink's letter of August 25, 2011 did not constitute a valid exercise of the option, a Lantel owner essentially conceded at trial that Petrolink validly exercised its purchase option under the lease. In fact, *the entire trial* revolved around a determination of the fair market value of the property as of August 2011, the date of Petrolink's letter providing notice of its intent to exercise the purchase option.

Lantel's trial strategy was to challenge the enforceability of the purchase option provision that it had drafted, or, in the alternative, seek to have the court determine that the value of the property as of August 25, 2011 was the $1.6 million that Lantel's appraiser had determined was the fair market value as of the time of Petrolink's exercise of the purchase option. Again, Lantel stated in its cross-complaint that "Petrolink exercised the Option to Purchase Parcel 1 pursuant to Section 21 of the Lease on or about August 25, 2011," and its position in the cross-complaint was that it was entitled to specific performance requiring that Petrolink purchase the property from it, at the value identified by Lantel's appraiser. In addition, a witness for Lantel essentially admitted that Lantel viewed the August 25, 2011 letter as a valid exercise of the purchase option, and Lantel did not argue at trial that Petrolink never exercised the purchase option. To have

12

argued otherwise would have undermined Lantel's claim that it was entitled to either breach of contract damages or specific performance of the contract for purchase and sale on the ground that Petrolink failed to purchase the property for the $1,615,000.00 that Lantel asserted was the fair market value. Lantel is therefore precluded from arguing on appeal, in conflict with its theory of the case in the trial court, that Petrolink's August 25, 2011 letter notifying Lantel of its intent to exercise the purchase option was not a valid exercise of the option under the terms of the parties' lease agreement. (See *Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874 [" 'The rule is well settled that the theory upon which a case is tried must be adhered to on appeal. A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant' "].)

Further, to the extent that Lantel argues that Petrolink's letter of August 25, 2011 did not constitute a valid exercise of the option because it was not an "unconditional acceptance of the terms of the purchase option" (capitalization omitted), such an argument is not one in support of affirmance of the judgment, but rather, is an attack on the entire premise of the judgment.[7] The judgment that the court entered is based on the

---

[7] At oral argument, counsel for Lantel indicated that he was not arguing that Petrolink never validly exercised the purchase option. Rather, he indicated that Lantel's position was that Petrolink was required to continue paying rents until such time as Petrolink could "perform" (i.e., purchase the property), and that performance could not occur until the fair market value of the property was determined by the court. However, Lantel argued in its briefing on appeal that Petrolink provided only " 'notice' " of its intention to exercise the purchase option, and that this " 'notice' did not . . . alter the

13

fact that Petrolink's valid exercise of the purchase option caused a contract for purchase and sale to come into existence, and it is this contract for purchase and sale that the court ordered Lantel to specifically perform in the judgment. Lantel's argument that the notice was insufficient to constitute a valid exercise of the purchase argument is not, therefore, an argument in support of affirming the judgment; rather, it is an argument that would require reversal of the judgment. If Lantel wanted to challenge the validity of the court's finding that Petrolink validly exercised the purchase option a finding that is a prerequisite to the court's ultimate determination that Petrolink was entitled to specific performance, it would have had to appeal from the judgment and contend that the trial court erred in making that finding. It did not do so.

We also reject Lantel's contention that in continuing to pay rent, Petrolink was acting according to the understanding of the parties that rent would remain owing so long as Petrolink continued to possess the property during the pendency of any lawsuit. As Petrolink explains in briefing, it had a logical reason for continuing to pay rents, a reason that had nothing to do with believing that such rents continued to be due. Petrolink states that it continued to pay rents in order to ensure that it would not be found to be in default

relationship of Lantel and Petrolink to that of vendor and vendee as argued by Petrolink." Lantel also contended in briefing that "Petrolink's August 25th letter conditioned its 'exercise' and willingness to enter into an agreement with Lantel [on] the parties reach[ing] an agreement on the 'fair market value' of the Property . . . ," and that therefore, "exercise [of the option] *was not complete* until the fair market value was determined." (Italics added.) Despite counsel's suggestion at oral argument that Lantel was *not* taking the position that Petrolink had not validly exercised the purchase option, the contentions in Lantels' briefing comprise, fundamentally, an argument that Petrolink *did not effectively exercise the purchase option*, that the rental agreement was therefore not extinguished (and no purchase and sale contract was formed) and as a result, rents under the rental agreement continued to be due.

14

of the lease in the event that the court later determined that it had not validly exercised the purchase option.  Ultimately, the trial court determined that Petrolink validly exercised the purchase option, and, again, the exercise of the purchase option caused the lease to cease to exist, and in its place was formed a contract for purchase and sale, which meant that Petrolink possessed the property as a vendee, rather than a lessee.  (See *Peebler*, *supra*, 122 Cal.App.2d at p. 506, see also *Sacks*, *supra*, 146 Cal.App.2d at pp. 887–888.)  Unless there was an express agreement in the lease that required the lessee to continue to make rent payments after the exercise of the purchase option, no further rents were due.  (*Sacks*, *supra*, at pp. 887–888.)  Lantel has not identified any provision in the lease that indicates that continuing rent payments would be due after the exercise of the purchase option.  The fact that Petrolink continued to pay rents in order to ensure that it would not be found in default in the event that it was later determined that it had not validly exercised the purchase option does not suggest that the parties had an agreement that rents would be due after the valid exercise of the purchase option.

Finally, we are unconvinced by Lantel's contention that the trial court made an equitable determination that Petrolink was not entitled to an offset of the rents that it paid after the exercise of its purchase option and through the pendency of the litigation.  Rather, based on the court's explanation in its "Statement of Intended Decision" (some capitalization omitted), it appears that the court erroneously believed that Petrolink was

15

not *entitled* to an offset of the rents, as a matter of contract law. In explaining its intention to deny Petrolink an offset for the rents that it paid after exercising the purchase option, the court stated, "Since the parties could not agree on the fair market value it was for the court to decide [the fair market value]. Hence the final requirement for [Paragraph 21 of the Lease] is this court's order fixing the fair market value at $889,854.00." The court's analysis indicates that it viewed the purchase and sale contract as not being enforceable until the court determined the fair market value of the property. The court believed that Petrolink was not entitled to an offset in rents until that condition was met. But, as we have already explained, the court's finding, expressed in the judgment that has been entered in this case, establishes that Petrolink validly exercised its option to purchase the property. The exercise of the purchase option extinguished the lease. No further rents could be due, even if the new contract that came into existence—a contract of purchase and sale—required a court to determine what the fair market value of the property was at the relevant time in the event that the parties could not reach an agreement on that issue.[8]

---

[8] The fact that the purchase option does not specify a price, but instead refers to the "fair market value" of the property, does not render the option unenforceable. (See *Goodwest Rubber Corp. v. Munoz* (1985) 170 Cal.App.3d 919, 921 ["[S]pecifying 'fair market value' as the price to be paid when exercising the option to purchase does not require future agreement of the buyer and seller" and "is a proper substitute for a specific purchase price and will support an action for specific performance"].)

16

Although we agree with Petrolink that it was entitled to an offset for the rents that it paid during the pendency of this litigation, it is fundamental that both the seller and the buyer are entitled to receive full performance of the contract where specific performance has been granted. (*Kassir v. Zahabi* (2008) 164 Cal.App.4th 1352, 1358, citing *Stratton v. Tejani* (1982) 139 Cal.App.3d 204, 212 (*Stratton*).) "[B]ecause execution of th[e] judgment [on a specific performance cause of action] will occur at a date substantially after the date of performance provided by the contract [or the reasonable date of performance if no set date is provided], financial adjustments must be made to relate their performance back to the contract date. [Citation.] First, when a buyer is deprived of possession of the property pending resolution of the dispute and the seller receives rents and profits, the buyer is entitled to a credit against the purchase price for the rents and profits from the time the property should have been conveyed to him. [Citations.] . . . Second, a seller also must be treated as if he had performed in a timely fashion and is entitled to receive the value of his lost use of the purchase money during the period performance was delayed. [Citations.]" (*Stratton*, *supra*, at p. 212.)

Certain limitations on these general rules are necessary, however, and should be considered by the trial court on remand. "First, the buyer may not receive both the profits and reasonable rental value of the property [or a credit for rents paid by the buyer himself] *and* the value derived from his use of purchase funds which were not irrevocably

17

allocated toward the purchase price. The buyer must reduce his credit for rents and profits by a sum equivalent to the value of his use of the retained purchase funds. [Citation.] Second, if any part of the purchase price has been set aside by the buyer with notice to the seller, the seller may not receive credit for his lost use of those funds. [Citation.]" (*Stratton*, *supra*, 139 Cal.App.3d at p. 213, italics added.)[9] In other words, although Petrolink is entitled to a credit to offset of the rents that it paid to Lantel during the period of time between when the transaction reasonably should have been completed and when the judgment was entered, Lantel is entitled to some amount of compensation to account for the fact that it did not have use of the purchase funds that it would have had in its possession from the time the purchase and sale contract reasonably should have been performed to the entry of judgment.

Granting a buyer the value of the profits and rents from the property from the time a transaction should have been consummated and adjusting this amount by the value of

---

[9] There is also a third limitation on the general rule that has limited or potentially no application here: "Third, any award to the seller representing the value of his lost use of the purchase money cannot exceed the rents and profits awarded to the buyer, for otherwise the breaching seller would profit from his wrong. [Citations.]" (*Stratton*, *supra*, at p. 213.) In this case, although the court ultimately entered judgment in favor of Petrolink, the buyer, on its cause of action for specific performance, it is clear that the court did not do so because it believed that Lantel, the seller, was solely at fault for the dispute between these parties. Rather, the court clearly concluded that neither party had presented a reasonable "fair market value" price for the property at issue, and therefore, that both parties bore responsibility in causing the matter to have to be litigated.

18

the seller's lost use of the purchase money " 'is designed to relate the performance back to the contract date of performance and to adjust the equities between the parties because of the delayed performance . . . .' [Citation.]" (*Stratton*, *supra*, 139 Cal.App.3d at p. 212.) "These adjustments are ' "more like an accounting between the parties than like an assessment of damages." ' " (*Id.* at p. 213.)

Therefore, on remand, the trial court should consider how to account for the delayed performance of the contract for purchase and sale that was created when Petrolink exercised the purchase option, and should do so with respect to both parties, according to the authorities cited above. In doing so, the court will also have to make a determination as to when, after Petrolink validly exercised the purchase option in the lease, the resulting contract for purchase and sale reasonably should have been performed.

IV.

DISPOSITION

The judgment of the trial court is reversed. The trial court is directed to determine the reasonable date on which the contract for purchase and sale should have been performed, and is further directed to consider what financial adjustments must be made in order to relate the parties' performance back to the date that the contract should have been performed. The trial court may undertake whatever further proceedings may be

necessary to address these matters.

The parties are to bear their own costs on appeal.


AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

GUERRERO, J.

20