Filed 4/18/23  Seneca Leandro View v. Estate of Delmore CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SENECA LEANDRO VIEW, LLC,<br><br>  Plaintiff and Appellant,<br><br>v.<br><br>ESTATE OF DONALD C. DELMORE,<br><br>  Defendant and Respondent. | A165593<br><br>(Alameda County<br>Super. Ct. No. RG19003497)<br><br>**ORDER MODIFYING OPINION; AND DENYING PETITION FOR REHEARING**<br> **[NO CHANGE IN JUDGMENT]** |

**BY THE COURT:***

   It is ordered that the opinion filed herein on March 30, 2023, be modified as follows.  On page 19, line 15, the following sentence is added to the end of the first full paragraph of the DISCUSSION section:

> Accordingly, we apply a de novo standard of review with respect to all alleged errors that have been properly raised and adequately presented by Seneca.  (*State Farm General Ins. Co. v. Oetiker, Inc.* (2020) 58 Cal.App.5th 940, 946 [summary judgment reviewed de novo];  *Barella v. Exchange Bank* (2000) 84 Cal.App.4th 793, 797–798 [issues of law reviewed de novo].)

> This modification does not effect a change in the judgment.

> Appellant's petition for rehearing is denied.

_____

   * Tucher, P.J., Fujisaki, J., and Rodríguez, J. participated in the decision.

1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SENECA LEANDRO VIEW, LLC,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>ESTATE OF DONALD C. DELMORE,<br><br>     Defendant and Respondent. | A165593<br><br>(Alameda County<br>Super. Ct. No. RG19003497) |

Seneca Leandro View, LLC (Seneca) appeals from a judgment confirming a final arbitration award.  The arbitrator rejected Seneca's breach of contract claims against the Estate of Donald C. Delmore (respondent), pursuant to which Seneca sought to compel specific performance of a contract to purchase a single family home from Donald Delmore (Donald), and to recover damages resulting from alleged breaches of the contract.  Seneca contends the arbitrator made errors of law.  We affirm the judgment.

**BACKGROUND**

**I.  The Lawsuit**

In January 2019, Seneca filed a complaint against Donald for breach of a written contract pursuant to which Donald agreed to sell his property on Haight Avenue in Alameda to Seneca for $650,000.  Seneca alleged that it

1

performed all of its obligations under the contract while Donald deliberately impeded escrow from closing and then terminated the contract for pretextual reasons. Seneca alleged causes of action for specific performance, damages for breach of contract and the implied covenant of good faith and fair dealing, and declaratory relief.

Seneca attached to the complaint a copy of the parties' contract, which consists of two documents. A 10-page form agreement titled "California Residential Purchase Agreement" was prepared by Seneca on March 5, 2018, signed by Donald on April 17, and signed by Seneca's principal, Alvin Cox, on April 30. This form agreement contains a provision requiring the parties to mediate disputes arising out of the agreement, and provides that any dispute not resolved by mediation shall be decided by neutral binding arbitration conducted in accordance with section 1283.05 of the Code of Civil Procedure. A "Supplemental Addendum" the parties signed on the same days they signed the California Residential Purchase Agreement contains a provision replacing the dispute resolution provision in the form agreement with the following:

> ARBITRATION OF DISPUTES: [¶] The parties wish to expeditiously resolve any disputes in the event they arise. Buyer and Seller agree that every dispute, claim or controversy arising out of or relating to this Property and this Purchase Agreement, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration . . . administered by JAMS, Inc. . . . The arbitrator(s) hearing the case shall enter a default judgment award against a Party who fails to pay their portion of the JAMS arbitration fees within thirty (30) days of a JAMS invoice being issued to the Party, notwithstanding any JAMS rules to the contrary. . . . The Parties also agree to participate in JAMS Optional Appeal Procedure or the appeal procedures in place at the time of the arbitration if requested by any Party. All Parties shall have the right to file and have a hearing on any dispositive motions including, but not

2

limited to, demurrers, motions to dismiss, and motions for summary adjudication, notwithstanding any JAMS rules in place at the time of the arbitration. The arbitrator(s) shall prepare in writing and provide to the Parties an award including factual findings and the reasons on which their decision is based. The Parties agree that they may seek judicial review in court after the JAMS decision becomes final. However, the judicial review shall be limited to correcting errors of law or legal reasoning only. The arbitrator shall have no authority to commit errors of law or legal reasoning, and the arbitrator's award may be vacated or corrected on that ground by a reviewing court.

On March 13, 2019, Donald passed away. His brother, Thomas Delmore (Thomas), was appointed administrator of Donald's estate. In November 2019, Seneca filed an amended complaint pursuant to which respondent, acting through its court appointed administrator, was substituted as the defendant in place of Donald.

## II. The Arbitration

On March 5, 2020, Seneca's unopposed petition to compel arbitration was granted, and court proceedings were stayed. On May 11, Seneca submitted its claims to the arbitrator, the Honorable John F. Herlihy (Ret.). Both parties filed motions for summary judgment of Seneca's claims. Following a hearing in November 2020, Judge Herlihy granted respondent's motion and denied Seneca's. Respondent filed a request for an award consistent with the summary judgment rulings, which the arbitrator granted, setting forth findings of fact and law in a 40-page Final Award issued on February 1, 2021.

3

## A. Facts Established by the Summary Judgment Evidence[1]

In 2018, Donald was unable to keep up with his property taxes, which led to a tax lien on his Haight Street residence (the property). Donald was very ill at the time, and his brother Thomas was helping him manage financial and personal matters. Seneca learned that the property was on a tax sale list and approached Thomas with a purchase offer. Donald agreed to the price Seneca offered.

On March 5, 2018, Seneca's attorney, Caroline Gegg, presented Donald and Thomas with a written offer to purchase the property, which was made on a California Residential Purchase Agreement form that later became the parties' contract. Seneca offered to purchase the property for $650,000, pursuant to the following terms: Seneca would make an initial deposit of $15,000, obtain a first loan for $455,000, and pay the balance of $180,000 pursuant to the instructions of the escrow holder. The offer did not call for

---

[1] The fact summary in the Appellant's Opening Brief is based primarily on a statement of *proposed* undisputed facts that Seneca submitted in support of its unsuccessful summary judgment motion, which is not evidence. Our de novo standard for reviewing summary judgment rulings " ' "does not obligate us to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues. As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority." ' " (*Bains v. Moores* (2009) 172 Cal.App.4th 445, 455.)

In any event, we base our review of the order affirming the arbitration award on the arbitrator's factual summary of the evidence. The "general rule" under California law is that "an arbitrator's decision cannot be reviewed for errors of fact or law." (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 11.) Here, the parties took themselves outside this general rule by agreeing to judicial review for errors of law or legal reasoning. (See *Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1361.) But they did not agree to judicial review of the arbitrator's factual determinations.

either side to be represented by a broker, and the Delmores had no counsel assisting them with this matter until July 2018.

On April 5, 2018, Seneca requested that an inspection service inspect the property. On April 17, Donald signed Seneca's offer. On April 26, Seneca contacted a lender to inquire about obtaining pre-approval for a loan, and on April 30, Seneca's principal, Mr. Cox, signed the contract to purchase Donald's property.

On May 3, 2018, Seneca requested that First American Title Company (First American) open an escrow account for the purchase and sale of the property, and on May 30, Seneca requested that its bank issue $15,000 for deposit into the escrow account.

On June 12, 2018, First American issued a preliminary title report, which indicated there was an outstanding deed of trust on the property that secured a $46,950 loan that had been obtained by a former owner. James and Barbara Rowney are named as beneficiaries of the deed of trust (hereafter, the Rowney DOT). Thomas retained an attorney, Ms. Fong, to assist the Delmores in evaluating the Rowney DOT.

The contract provided for escrow to close 120 days after "Acceptance" of the contract, which was either August 17 or August 30, 2018, depending on when the contract was deemed accepted. At some time in August, Seneca asked Thomas to agree to extend the date for closing escrow, and on October 3, Donald signed an addendum to the escrow instructions, which First American had drafted at the request of Seneca. The addendum states that "Buyer and Seller agree to extend the close of Escrow to November 30, 2018," and that "All other terms and conditions of this Escrow will remain the same." (Boldface & block print omitted.)

On October 12, 2018, Cox and Seneca obtained a loan proposal from LendingOne, a commercial lender. LendingOne described this proposal as a "general, non-binding expression of interest" that was subject to various conditions, including, a credit check to be conducted by the lender, a third party appraisal of the value of the property, and a requirement that Seneca obtain "acceptable property insurance." A few days later, LendingOne followed up with a request for information, including a homeowner's insurance policy, permission from Cox's wife to use specified funds, title work, and an approved appraisal report.

Meanwhile, the Delmores' attorney, Ms. Fong, was attempting to resolve the issue of the Rowney DOT. She asked the Delmores to attempt to locate financial records belonging to the former property owners that might reflect whether the loan had been paid off. She also attempted to contact the beneficiaries directly. On October 9, Fong sent a letter to Mrs. Rowney about the matter and, after receiving no response, spoke to her in person. Rowney said she did not know if the loan had been paid off because her late husband, who was a cobeneficiary of the DOT, had handled their business matters.

On October 31, 2018, Gegg sent Fong an email about the loan proposal that Seneca had obtained from LendingOne. In a response, Fong noted that she had made some progress toward resolving the Rowney DOT matter and shared the details of her investigation. The next day, Gegg sent an email responding that Seneca had a good relationship with First American, and that First American might accept something short of a quiet title or declaratory relief judgment.

In November 2018, the Delmores found some payment records relating to the Rowney DOT in the records of the former property owner. Fong emailed the documents to First American and also updated Gegg. On

6

November 21, Fong received an email from Mr. Alonzo at First American. Alonzo stated that First American had removed the Rowney DOT as an exception to title and attached a Supplemental Title Report, which stated that the title report had been modified to eliminate "Exception 5." That same day, Gegg acknowledged to Fong that Seneca received the Supplemental Title Report and advised that an inspection of the sewer lateral at the property and an appraisal inspection were planned for the following week.

On November 23, 2018, Gegg emailed Fong about the status of the Rowney DOT. Gegg stated that although it appeared First American was willing to remove the deed of trust as an exception to this one transaction, Seneca wanted to avoid future complications and "would prefer to have a reconveyance recorded . . . before closing." Gegg asked Fong whether the "surviving beneficiary would be willing to assist in providing such a reconveyance."

On November 26, 2018, Fong sent an email to Gegg and Alonzo, attaching a copy of Gegg's November 23 email. Fong sought clarification that First American was insuring title so it would no longer be an issue for the buyer. Fong also explained that the Delmores had located some payment registers in the former property owner's records but stopped their search when First American advised them the Rowney DOT had been removed from the report, as they had already spent many hours at that "huge task," which was made "especially difficult" due to Donald's ill health. Finally, Fong advised Gegg that it would be inappropriate for Fong to ask Mrs. Rowney for a reconveyance because Rowney was an elderly woman who did not remember if the deed of trust had been paid.

In response to Fong's email, Gegg notified Fong that Seneca continued to object to taking defective title, urged Fong and the Delmores to pressure

7

Rowney to execute a reconveyance, and offered to pay Rowney $500 to expedite the matter. Fong disagreed with Gegg's approach and tensions mounted. On November 30, a title officer at First American sent an email to Fong, with a copy to Gegg, which contained the following statement: "By issuing a Supplement to eliminate an 'Exception' from coverage, that Exception is no longer an Exception and is now covered by the Insurance Policy. . . . If the Seller[']s attorney is still concerned, then they or Escrow can obtain a Substitution of Trustee and Full Reconveyance."

The extended date for the close of escrow, November 30, 2018, came and went with no closing. Fong emailed Gegg, asking if Seneca was refusing to close escrow because of the Rowney DOT. Gegg replied that Seneca would not close escrow until the issue of the Rowney DOT was resolved.

On December 7, 2018, Gegg sent a letter to Mrs. Rowney, ostensibly to provide her with information to help her make an informed decision about whether to execute a reconveyance. Meanwhile, Seneca was continuing to negotiate with LendingOne for a loan. On December 10, LendingOne made another proposal, again non-binding and subject to conditions including a third party appraisal and proof of insurance, which Seneca had not yet provided, and other documentation. That same day, Seneca served a "Notice to Seller to Perform," which stated that if the Delmores failed to satisfy their obligations to remove the Rowney DOT and to provide Seneca with a verification that the property was vacant within two days, Seneca had a right to cancel the contract.

Mrs. Rowney signed a reconveyance document on December 11, 2018. On December 18, Gegg sent a copy of the document to Fong with notice that Seneca was prepared to move forward with the contract, and that certain work needed to be done at the property before escrow could close. Gegg also

8

stated that Seneca had obtained a proposal for sewer work, and sought permission to contact Thomas directly to arrange for access to the property.

On December 20, 2018, Fong sent an email to Gegg requesting copies of the following documents that Seneca was required to provide but the Delmores were unable to find in their file: written verification of down payment; a loan approval letter; evidence of loan contingency removal; notice of removal of all contingencies.

On December 21, 2018, Seneca executed a document titled "Contingency Removal No. 1," which stated that Seneca removed some contingencies but not others. Seneca did not remove contingencies for repairs that needed to be complete prior to closing escrow, proof of occupancy status, and the right to review buyer disclosures. Gegg attached Seneca's contingency removal document to an email to Fong. In her email, Gegg characterized the October 2018 proposal from LendingOne as proof of loan approval and, regarding proof of down payment, Gregg stated: "In regard to your request for verification of the down payment, my client sent a Cashier's check dated May 30, 2018, to First American Title Company (attached). It is my understanding that in June 2018, First American Title Company sent your client a form for an early release of the deposit (attached)."

On December 21, Fong responded to Gegg's email, sending a copy to First American. Fong renewed her request for verification of down payment pursuant to section 3H of the contract, clarifying that this was a separate obligation from making the deposit, and that the verification should have been delivered on April 22, 2018. Fong also stated that the October 2018 LendingOne letter was not "evidence of loan contingency removal," and requested that First American confirm that it had received loan documents and state when they were received.

Gegg responded to Fong's email on December 23. Gegg stated that Seneca had provided LendingOne with evidence of 14 financial accounts and Gegg was attaching redacted statements from four of those accounts, which was evidence Seneca had funds to cover the down payment and closing costs. Gegg also stated that Seneca removed the loan contingency in its "Contingency Removal No. 1" document. Finally, Gegg stated that Seneca had been approved by LendingOne but repair work needed to be completed at the property before the loan would be funded.

On January 10, 2019, Donald executed a "Demand to Close Escrow," which demanded that Seneca close escrow within three days. The demand was served on Gregg that same day. Escrow did not close within three days or ever. Seneca did not fund the escrow, place loan documents in escrow, or deliver a loan commitment letter to the Delmores. The Delmores did not waive or excuse Seneca from performing the buyer's contractual obligations, with the sole exception of agreeing to extend the date for close of escrow to November 30, 2018.

On January 13, 2019, Gegg sent a letter advising Fong that Donald had "no legal right to demand the close of escrow" because he had not "complied with the required prerequisites" and had breached the agreement by failing to comply with Seneca's notice to perform. Gegg advised Fong to consider Gegg's letter as a second notice to perform and requested a prompt response. On January 18, Fong sent a response, stating that the agreement was "over" because Seneca failed to perform its contractual obligations. Seneca filed suit on January 22.

10

### B. The Grant of Summary Judgment to Respondent

The arbitrator granted respondent summary judgment based on the evidence summarized above, finding no triable issue of material fact as to the four causes of action Seneca alleged against Donald.

### 1. Specific Performance

Seneca's first cause of action was for specific performance of the contract. In evaluating this claim, the arbitrator was guided by three legal principles: First, the party seeking specific performance must show that it performed its contractual obligations or that such performance was excused. (Citing *Ninety Nine Investments, Ltd. v. Overseas Courier Service (Singapore) Private, Ltd.* (2003) 113 Cal.App.4th 1118, 1126 (*Ninety Nine Investments*).) Second, the party must show that it was "ready, willing and able to perform both at the time the original contract was entered into and during the specific performance action." (*Ibid.*) Third, a provision in a contract that " 'time is of the essence' " means that the contracting parties specifically intended for contractual obligations to be performed at or before the time specified. (Citing 12 Miller & Starr, Cal. Real Est. (4th ed. 2022) § 2:19 & 40:19; Civ. Code, § 3391.)

The arbitrator found that Seneca did not have a right to seek specific performance of its contract with Donald because the summary judgment evidence showed that Seneca failed to perform multiple contractual obligations, and Seneca failed to raise a triable issue of fact with respect to this essential requirement of a specific performance claim.

First, Seneca did not provide written verification of a down payment within five days after acceptance of the contract, as required by paragraph 3H of the Purchase Agreement. When Fong requested this document from Gegg on December 21, 2018, Gegg responded by providing financial

information ostensibly showing that Seneca had funds to cover the down payment and closing costs. The financial documents that Gegg referenced in her December 23 email response were not produced at the arbitration and, in any event, Gegg's email did not create a triable issue as to whether this contractual obligation was met, the arbitrator found.

Seneca argued that the five day period for complying with this down payment verification requirement was extended indefinitely, notwithstanding that the contract contained a time is of the essence clause, because Donald did not serve a "Notice to Buyer to Perform" this obligation pursuant to paragraph 14D of the Purchase Agreement. That paragraph pertains to the procedure for giving notice three days prior to the seller's cancellation of the contract. It does not, the arbitrator found, give the buyer "the right to satisfy its obligations after the time specified for performance in the Purchase Agreement."

Second, Seneca failed to comply with paragraph 3J(1) of the Purchase Agreement, which required that, within 30 days after acceptance, Seneca was to deliver a letter to Donald from Seneca's lender or loan broker stating that Seneca had submitted a loan application and been preapproved for the $450,000 loan required for purchase of the property. Seneca argued that it satisfied this requirement by providing Donald with copies of the loan proposals that LendingOne made in October and December 2018. The arbitrator found that even if these proposals were pre-approvals, they were not provided within 30 days of acceptance.

Third, Seneca did not comply with paragraph 3D of the Purchase Agreement, which required Seneca to obtain a $450,000 loan as part of the purchase price. The arbitrator found that, although the agreement did not specify a date when this condition had to be satisfied, the effect of the time is

12

of the essence provision was that the loan had to be obtained by the close of escrow date.  The summary judgment evidence showed that Seneca had not obtained a loan by the initial close of escrow date or by November 30, 2018, the extended date for the close of escrow.

Fourth, Seneca did not comply with paragraph 3J(3) of the Purchase Agreement, which required it to remove the loan contingency or cancel the agreement within 45 days of Donald's acceptance of the contract.  Seneca relied on evidence showing that it "conditionally removed" the loan contingency in December 2018 when it obtained a confirmation of LendingOne's loan proposal.  This evidence did not establish timely compliance with the requirement to remove this contingency, and Seneca proffered no evidence to show it was excused from complying with the deadline, the arbitrator found.

Fifth, Seneca did not comply with paragraphs 14B(3) and 31 of the Purchase Agreement, which required Seneca to remove a property appraisal contingency or cancel the agreement within 45 days after signing the contract.  The summary judgment evidence showed that Seneca had the property appraised on November 30, 2018, the extended date for the close of escrow, several months after the June 2018 deadline for removal of the appraisal contingency or cancellation of the contract.

In addition to finding that Seneca could not show it was entitled to specifically enforce the contract, the arbitrator also found that any right of the parties to specific performance terminated when both parties failed to perform concurrent conditions during the time for performance of the contract.  (Citing e.g., *Pittman v. Canham* (1992) 2 Cal.App.4th 556 (*Pittman*); *Galdjie v. Darwish* (2003) 113 Cal.App.4th 1331 (*Galdjie*).)  The arbitrator reasoned as follows:  The parties agreed to a fixed date for the close

13

of escrow and they also agreed that time was of the essence. At both the initial and extended dates for the close of escrow, neither party had performed concurrent obligations; Seneca did not fund escrow and Donald did not provide title. The failure of both parties to perform concurrent conditions resulted in a discharge of both parties' duty to perform, thus extinguishing Seneca's right to seek specific performance. (Citing *Pittman, supra,* 2 Cal.App.4th 556.)

Seneca argued that its right to compel specific performance did not terminate so long as the contract itself was not terminated, and that the contract was not terminated because it contains an agreed upon procedure for cancellation that Donald allegedly failed to follow. In response, the arbitrator found (1) the issue was not whether Donald followed the proper procedure for cancelling the contract, but whether Seneca could compel specific performance; and (2) Donald did serve a formal written demand to close escrow on January 10, 2019, thus giving Seneca three days to perform as required by paragraph 14G of the Purchase Agreement.

Seneca also argued that Seneca's right to specific performance had not terminated because Donald's conduct during the contract-performance period excused Seneca from its obligation to perform. There were two parts to this argument, and the arbitrator rejected both. First, Seneca argued that Donald prevented Seneca from obtaining a loan. It based this argument on evidence that Fong did not respond to requests for access to the property to make repairs, claiming that it was this issue that prevented Seneca from obtaining formal approval from LendingOne. The arbitrator found no triable issue as to the contention that Donald prevented Seneca from obtaining a loan because Seneca's requests for access to the property were all made after the date for the close of escrow had already passed.

14

Finally, Seneca argued that Donald's failure to perform a contractual obligation to assist Seneca in resolving the Rowney DOT excused Seneca from having to fund escrow or perform multiple other obligations. Seneca relied on paragraph 13B(i) of the Purchase Agreement, which states that the buyer's obligation to take title in its "present condition" does not apply to monetary liens of record that the seller is "obligated to pay off." The arbitrator interpreted this provision to refer to liens recorded against the property for money that the seller owed to a third party. Undisputed evidence showed that the Rowney DOT was for a debt of the prior property owner. Moreover, the arbitrator found, even if paragraph 13 imposed an obligation on Donald to assist Seneca in resolving the Rowney DOT, Seneca failed to produce evidence to raise a triable issue of fact as to whether such an obligation was breached. Instead, the evidence showed that the Delmores and Fong "sought to obtain information from Ms. Rowney and engaged in communications designed to resolve this issue."

## 2. Breach of Contract and Breach of the Implied Covenant

The arbitrator found that the plaintiff's performance or excuse from performance of its contractual obligations is an essential element of a cause of action for breach of contract. (Citing *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821; *Consolidated World Investments, Inc. v. Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 380.) It granted respondent summary adjudication of this claim based on evidence that Seneca did not fulfill its contractual obligations, and Seneca's failure to produce evidence to raise a triable issue as to this element of its claim. On the same basis, the arbitrator granted respondent summary adjudication as to Seneca's related cause of action for breach of the implied covenant of good faith and fair dealing.

15

### 3. Declaratory Relief

Seneca sought declaratory relief to establish that it had complied with all terms of the Purchase Agreement and had a right to specific performance of the contract. As the arbitrator had already found otherwise, he concluded there was no actual controversy and granted summary adjudication of this declaratory relief claim.

### C. The Denial of Summary Judgment to Seneca

Arguments and evidence relating to Seneca's motion for summary judgment were "largely identical" to those presented in connection with respondent's motion. Thus, the arbitrator applied its prior rulings to deny Seneca summary judgment of its claims for specific performance and declaratory relief, and to deny Seneca summary adjudication on the liability portion of its causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing. The arbitrator additionally found that the summary adjudication motion failed as a matter of law because (1) the Code of Civil Procedure does not authorize partial summary judgment as to liability, and (2) Seneca had proffered no evidence to establish the damages element of its breach of contract cause of action. (Citing *Paramount Petroleum Corp. v. Superior Court* (2014) 227 Cal.App.4th 226, 241.)

### D. Allocation of Fees and Costs

After respondent was granted summary judgment, it filed a motion for allocation of fees and costs incurred during the arbitration, which Seneca opposed. Paragraph 25 of the Purchase Agreement contains a provision entitling the prevailing party to attorney fees and costs, but the Supplemental Addendum signed by the parties deleted paragraph 25 and replaced it with a provision that states, in part: "Each party shall bear its/their own attorneys' fees and costs, if any." Respondent argued that,

16

because this provision does not expressly address arbitration fees and costs, the arbitrator should allocate them all to Seneca, the non-prevailing party.

The arbitrator found that respondent was the prevailing party at the arbitration, but it was not entitled to an allocation of fees because the contract provides that each party shall bear their costs. The arbitrator reasoned that, although the Supplemental Addendum does not expressly mention *arbitration* fees and costs, the only reasonable interpretation of the provision is to apply it to arbitration fees. Alternatively, the arbitrator found that an allocation of fees would be discretionary, and declined to exercise his discretion to allocate fees in light of the language in the Supplemental Addendum.

## III. Seneca's Appeal to the JAMS Appeal Panel

Seneca filed a JAMS appeal from the final award. Respondent refused to pay half the JAMS appellate fees, so Seneca paid them. After Seneca's appeal was briefed and argued, the appellate panel issued an 18-page decision affirming the final award.

As a preliminary matter, the panel rejected Seneca's request for entry of a "default" against respondent for failing to pay its share of the appellate fees, finding no basis in California law or the JAMS rules for entering such a default. Seneca relied on a JAMS procedural rule, which states that " 'nonpayment of fees may result in an administrative suspension of the case.' " The appeals panel found this rule did not apply.

The panel then applied de novo review to the summary judgment rulings set forth in the final award and affirmed all of the arbitrator's findings. The appellate panel also agreed with the arbitrator's interpretation of a provision in the Supplemental Addendum requiring the parties to bear their own costs and fees. However, the panel ordered respondent to

17

reimburse Seneca for respondent's one half share of the appellate fees, amounting to $15,908.67.

## IV. Confirmation of Final Award and Entry of Judgment

On September 30, 2021, respondent filed a petition to confirm the arbitration award, which Seneca opposed. Following briefing and argument, the superior court granted respondent's petition.

The trial court's order contains a brief background summary, which reflects that the property was sold in October 2021, while the petition to confirm the arbitration award was still pending. Respondent argued that the entire issue of specific performance was, therefore, moot. The court framed the issue differently, stating that to the extent Seneca sought a modification of the arbitration award to grant specific performance, that issue was moot.

Seneca opposed respondent's petition to confirm the award on three grounds: (1) Seneca fully performed under the Purchase Agreement, (2) Seneca was entitled to a default judgment in its favor, and (3) Seneca was entitled to damages.

Applying de novo review, the trial court rejected Seneca's contention that it fully performed, concluding that the arbitrator's findings with respect to this issue are supported by the facts and the law. The court also affirmed the finding of the JAMS Appeal Panel that Seneca is not entitled to a default judgment award, concluding that such a request is non-applicable once a Final Award has already been entered. Seneca's final claim of error was that the award should not be confirmed because the JAMS Appeal Panel failed to consider whether Seneca was entitled to damages resulting from Donald's breach of the parties' contract. The trial court rejected this argument because, absent a showing that the arbitrator and Appeal Panel committed errors of law or legal reasoning, "Seneca is not entitled to damages."

18

Judgment confirming the arbitration award was entered on May 25, 2022. The judgment dismisses with prejudice all of Seneca's claims against respondent, identifies respondent as the prevailing party in the action, and concludes: "Each party to bear its own costs and attorney's fees pursuant to the contract at issue in the action."

## DISCUSSION

### I. Issues on Appeal

Seneca contends the arbitrator's decision "contains multiple errors of fact and law." The arbitration provision that Seneca drafted indicates that the arbitrator's findings of fact are not subject to judicial review. Therefore, we focus our discussion on alleged errors of law, which we review based on the factual evidence summarized by the arbitrator. Assuming without deciding that some limited review of the arbitrator's factual findings is permissible under the parties' agreement, Seneca would have to show that a factual finding by the arbitrator is erroneous as a matter of law.

Respondent contends this court does not have jurisdiction to review issues pertaining to Seneca's claims for specific performance and declaratory relief because the property has been sold, which means that the court cannot provide Seneca with "effectual relief" even if some error occurred below. We disagree with respondent's theory of mootness. Although Seneca's causes of action seek different types of relief, they are all based on the claim that Donald breached the contract. (See *Rogers v. Davis* (1994) 28 Cal.App.4th 1215, 1220 ["specific performance and damages are separate remedies for breach of contract"].) For this reason, the arbitrator made many of the same findings in ruling separately on each cause of action. The fact that specific performance is no longer an available remedy does not mean Seneca's entire claim for breach of contract is moot because damages may still be a remedy.

19

Thus, any request by Seneca to modify or reverse the judgment to allow for specific performance is moot, but its claims of legal error are not.

## II. Seneca's Failure to Perform Contractual Obligations

Seneca contends that the arbitrator's finding that Seneca did not perform its contractual obligations rests on an erroneous interpretation of paragraph 14D of the Purchase Agreement. The JAMS appeal panel and the trial court rejected this argument, as do we.

Paragraph 14 is titled "**TIME PERIODS; REMOVAL OF CONTINGENCIES; CANCELLATION RIGHTS**." It contains a prefatory provision stating that certain time periods provided in the agreement may only be changed by mutual written agreement, and that removal of contingencies or cancellation under this paragraph must be exercised in good faith and in writing. Paragraph 14 also contains several subparagraphs, including paragraph 14D, titled "**SELLER RIGHT TO CANCEL**." This paragraph authorizes the seller to cancel the contract if the buyer fails to comply with deadlines for removing contingencies or fails to perform other specified contractual obligations. The seller may exercise this right of cancellation after first delivering to the buyer a "Notice to Buyer to Perform." Relatedly, paragraph 14E provides that a Notice to Buyer or Seller to Perform must be a signed writing giving the party receiving notice at least two days to "take the applicable action."

Seneca argues that paragraph 14D establishes that Seneca did not fail timely to perform its contractual obligations. There are two parts to this double negative argument: First, since the seller has no contractual right to cancel the contract without first giving the buyer 48 hours to cure, it necessarily follows that the buyer cannot be found to have breached the contract "unless or until" it misses the two-day deadline set by delivery of the

20

Notice to Buyer to Perform. Second, since Donald never served a Notice to Buyer to Perform, Seneca cannot be found to have failed timely to perform any of its contractual obligations.

The arbitrator's rejection of Seneca's argument was not legal error. First, Seneca misconstrues paragraph 14D. This provision gives *the seller* a right to cancel under certain conditions, it does not give the buyer a right to perform time-specific obligations after the time provided for in the Purchase Agreement. As the arbitrator found, paragraph 14D "does not expressly, impliedly, or effectively extend the time periods for performance set forth in the Purchase Agreement." Accepting Seneca's contrary theory—that deadlines for performance of obligations set forth in the contract are not really deadlines at all—would eviscerate paragraph 29 of the Purchase Agreement, titled "**TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES**." This provision states, among other things, that "Time is of the essence," the terms as written are intended to express the parties' agreement, and "**Neither this Agreement nor any provision in it may be extended, amended modified, altered or changed, except in writing Signed by Buyer and Seller**."

The second part of Seneca's argument is also flawed. The question whether Donald followed paragraph 14D's procedure for canceling the contract was factually irrelevant to the issues that were before the arbitrator. As the arbitrator explained, paragraph 14D of the Purchase Agreement is not pertinent here because this is not an action by respondent to cancel the contract. This is a breach of contract action by Seneca, which puts the burden on Seneca to prove entitlement to specific performance or, alternatively, damages. An essential requirement of specific performance is that the party seeking to enforce the contract must have performed its own

21

contractual obligations. (*Ninety Nine Investments, supra*, 113 Cal.App.4th at p. 1126.) By the same token, a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performance. (*Consolidated Word Investments, Inc. v. Lido Preferred Ltd., supra*, 9 Cal.App.4th at p. 380.)

In a related argument, Seneca contends that the arbitrator committed legal error in finding that the contract terminated by operation of law despite the fact that the contract contains a procedure the parties must follow for cancellation to occur.[2] The arbitrator did not find that the contract terminated by operation of law, but rather that Seneca's right to specific performance terminated by operation of law. The right to specific performance terminated (irrespective of any formal termination of the contract) when both parties failed to perform concurrent conditions during the time for performance. (*Pittman, supra*, 2 Cal.App.4th at p. 560.)

Seneca contends that its contractual obligation to close escrow at the agreed-upon time was excused, and that the arbitrator's contrary conclusion was legal error. According to this argument the "legal analysis" in the Final Award is not supported by cases the arbitrator cited, *Pittman, supra*, 2 Cal.App.4th 556, and *Goldjie, supra*, 113 Cal.App.4th 1331.

---

[2] Seneca views this issue as purely a matter of contract interpretation, which again overlooks the fact that the arbitrator was addressing a different issue—whether Seneca's conduct during the performance period was such that Seneca could compel specific performance. Specific performance is "an action in equity," and equity "is not bound by rigid precedent, but has the flexibility to adjust the remedy in order to do right and justice." (*Hutton v. Gliksberg* (1982) 128 Cal.App.3d 240, 249.) Even when the other party has committed an actionable breach, an arbitrator has broad discretion to determine whether specific performance is an appropriate remedy. (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 373–376.)

In *Pittman*, a real estate broker (Pittman) drafted a contract to purchase a 56-acre parcel of property from Ms. Canham, who was 85 years old at the time, for $250,000. (*Pittman, supra*, 2 Cal.App.4th at p. 558.) The contract provided that escrow would close within 30 days and that time was of the essence. (*Ibid*.) The closing date "came and went," without Pittman tendering payment or Canham tendering a notarized deed. (*Ibid*.) A few months later, Canham sold the property to another buyer for $600,000, and Pittman sued for breach of contract. (*Id*. at pp. 558–559.) After the evidence phase of trial, the court granted Canham's motion for nonsuit "on the ground that time was of the essence of the contract and neither party tendered performance." (*Id*. at p. 559.) The trial court also issued a statement of decision, which contained findings that "Pittman and not Canham was responsible for the delay in performance," Canham did not "waive[]" time for performance, and Pittman "defaulted when he failed to tender the purchase money, note and deed of trust" by the close of escrow date. (*Ibid*.) Judgment was entered in favor of Canham.

On appeal, Pittman challenged the finding that he had defaulted by failing to tender payment. (*Pittman, supra*, 2 Cal.App.4th at p. 559.) He argued that because tender of payment and tender of the deed were concurrent obligations, the failure of both parties to perform did not automatically terminate the contract; instead, appellant argued, one party had to tender performance before the other could be found in default. (*Ibid*.) Rejecting this argument, the Court of Appeal held: "[T]he failure of both parties to perform concurrent conditions does not leave the contract open for an indefinite period so that either party can tender performance at his leisure. The failure of both parties to perform concurrent conditions during the time for performance results in a discharge of both parties' duty to

perform." (*Id*. at pp. 559–560.) Moreover, the court found, "where the parties have made time the essence of the contract, at the expiration of time without tender by either party, both parties are discharged." (*Id*. at p. 560.) The *Pittman* court also rejected Pittman's argument that the time for his performance had been waived, concluding that "the trial court held that there has been no waiver, and there is nothing in the record that requires us to disturb that finding." (*Ibid*.)

Seneca fails to show that the arbitrator misapplied *Pittman's* holdings. To the contrary, *Pittman* is authority for the arbitrator's finding that when the parties failed to perform concurrent obligations on or before the date set for closing escrow, both parties' right to seek specific performance terminated. (*Pittman, supra*, 2 Cal.App.4th at pp. 559–560.) As the *Pittman* court explained, "in a contract with concurrent conditions, the buyer and seller cannot keep saying to one another, 'No, you first.' Ultimately, in such a case, the buyer seeking enforcement comes in second; he loses." (*Id*. at p. 560.)

*Galdjie* was an action by a buyer for specific enforcement of a contract to purchase an apartment building in Santa Monica. (*Galdjie, supra*, 113 Cal.App.4th at p. 1334.) The case was tried to the court and resulted in a judgment in favor of the buyer, which was affirmed on appeal. (*Id*. at pp. 1334–1336.) Pertinent here, the Court of Appeal confirmed the general rule that a buyer in a real estate transaction has no right to specific enforcement of the contract if he fails to timely deposit the funds to complete the purchase into escrow and the contract specifies that time is of the essence. (*Id*. at pp. 1337–1338.) *Galdjie* also confirms that "failure of the buyer to remove a lender approval contingency justifies cancellation on the part of the seller." (*Id*. at p. 1338.) Neither principle was dispositive in

24

*Galdjie* though, because the trial court found that the seller had waived the timeliness provisions in the parties' contract, and that finding was supported by substantial evidence. (*Id.* at pp. 1339–1340.) Seneca fails to show that the arbitrator's legal reasoning is inconsistent with *Galdjie*. To the contrary, *Galdjie* confirms that "California courts generally *do* strictly enforce time deadlines in real estate sales contracts, permitting the seller to cancel after the time specified where time is specifically made of the essence *unless* there has been a waiver or potential forfeiture." (*Id.* at p. 1341, emphasis in original.)

In its effort to characterize the arbitrator's discussion of the parties' cases as legal error, Seneca confuses the issues on appeal. Seneca is actually objecting to the arbitrator's rejection of its claim that it was excused from performing contractual obligations. In this regard, Seneca purports to show that *Pittman* is factually distinguishable and *Galdjie* is factually analogous, and then posits that, under *Galdjie*, Seneca's request for specific performance should have been granted. In a similar vein, Seneca contends repeatedly but without analysis that this case is "just like" *Ninety Nine Investments, supra,* 113 Cal.App.4th 1126, which reversed a judgment denying a buyer specific performance of a contract on the ground that the trial court's findings were not supported by substantial evidence.

As discussed, our review of the arbitration award is limited to alleged errors of law. Under settled contract law, a material breach of the contract " 'excuses further performance by the innocent party.' " (*Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590, 1602.) " 'Normally the question of whether a breach of an obligation is a material breach, so as to excuse performance by the other party, is a question of fact.' " (*Id.* at pp. 1602–1603.) Similarly, the question whether timeliness provisions in a contract have been waived by the

25

party for whose benefit they were made is a question of fact, unless only one reasonable inference can be drawn from the evidence. (*Kossler v. Palm Springs Developments, Ltd.* (1980) 101 Cal.App.3d 88, 99.) On appeal, Seneca does not demonstrate that the arbitrator committed an error of law in concluding that Seneca failed to raise a triable issue of fact regarding its claim that performance of its contractual obligations was excused.

In opposing summary judgment, Seneca's primary argument was that Donald's failure to resolve the Rowney DOT or to assist Seneca in resolving it constituted a material breach of the contract, which excused Seneca's performance of its contractual obligations. The arbitrator found first that Donald had no contractual obligation to remove the Rowney DOT, a finding that Seneca does not challenge on appeal. The arbitrator also found that the Delmores *did* assist Seneca with this matter. We have summarized the evidence supporting this finding. Seneca fails to show any triable issue that could arguably be construed as legal error.

## III.  Issues Pertaining To JAMS Fees

As discussed in our background summary, Seneca paid the JAMS fees relating to its appeal of the arbitrator's final award. Seneca makes two claims of error relating to these fees, contending that (1) the JAMS Appeal Panel erred by failing to enter a default judgment against respondent; and (2) the trial court erred by failing to include a provision in the judgment requiring respondent to reimburse Seneca for respondent's share of the appellate fees.

### A.  Seneca Was Not Entitled to a Default Judgment

Seneca contends that "pursuant to the plain terms of the parties' arbitration agreement, Seneca is entitled to a default judgment on all of its claims as a matter of law." We disagree.

26

Our background summary recounts the arbitration agreement, which is contained in the Supplemental Addendum. That agreement provides that claims arising out of the contract are to be resolved by arbitration, to be administered by JAMS pursuant to its expedited procedures, and that the arbitrator "hearing the case shall enter a default judgment award against a Party who fails to pay their portion of the JAMS arbitration fees" within 30 days of service of an invoice. The arbitrator who heard this case was Judge Herlihy, not the JAMS Appeal Board. Judge Herlihy decided Seneca's claims on the merits and issued a detailed final award in favor of respondent. There was no issue about payment of fees in the arbitration before Judge Herlihy and no default judgment was entered.

Seneca points to no language in the arbitration agreement supportive of its contention that a default judgment must be entered against the party who obtains a favorable ruling on the merits from the arbitrator that hears the case. Thus we reject Seneca's contention that respondent was in default within the meaning of the arbitration agreement when respondent refused to pay its share of the JAMS appeal fees. Seneca fails to show any legal error associated with the ruling by the JAMS Appeal Panel denying Seneca's request for a default judgment against respondent.

**B. The Judgment May Be Corrected**

Although the JAMS Appeal Panel denied Seneca's default request, it found that respondent must reimburse Seneca $15,908.67, which represents respondent's share of the JAMS appeal fees. Seneca contends that the trial court erred by entering a judgment that is inconsistent with the Appeal Panel's ruling. According to this argument, a provision in the judgment that each party shall bear their own attorney fees and costs pursuant to the terms

27

of their contract conflicts with the finding by the JAMS Appeal Panel that respondent must pay Seneca $15,908.67.

We reject Seneca's characterization of this issue as judicial error. First, Seneca fails to show or even contend that it brought this matter to the attention of the trial court. " ' "As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal." ' " (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 548 (*Hewlett-Packard*); *Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 997.) Moreover, we see no obvious conflict between the JAMS ruling and the judgment requiring each party to bear its own costs; a payment of one half of the JAMS appellate fees *is* respondent's share of the arbitration costs.

However, the discussion of this matter in the appellate briefs is disconcerting. Seneca intimates that respondent is refusing to pay this fee, but cites nothing in the record. Respondent, on the other hand, contends that there is no need to include the reimbursement order in the judgment, but it does not clearly acknowledge that it has an obligation to make this payment. This colloquy indicates that a modification of the judgment is in order. "[A]n appellate court may correct a judgment containing an obvious clerical error or other defect resulting from inadvertence by modifying the judgment." (*Hennefer v. Butcher* (1986) 182 Cal.App.3d 492, 506–507.) The change may not " 'substantially' " modify the original judgment unless the record clearly shows that " 'the error was not the result of the exercise of judicial discretion.' " (*Id*. at p. 507.) Here the record is clear that the trial court intended the judgment to incorporate the rulings of the arbitrator and the Appeal Panel. Thus, we will modify the judgment to clarify that respondent is required to reimburse Seneca for respondent's share of the JAMS appeal fees.

## IV. The Dispute About Seneca's Deposit

Seneca contends that the trial court erred by failing to make a ruling regarding the $15,000 down payment that Seneca delivered to First American. According to Seneca, there was no dispute during the arbitration, that this deposit was released to Donald. Nor can there be any dispute, Seneca contends, that when Donald canceled the contract, he was required to return the buyer's deposit pursuant to paragraph 14D(1) of the Purchase Agreement. Therefore, Seneca concludes, the arbitrators should have made a ruling regarding "disposition" of the deposit, and the trial court's failure to do so constitutes error.

Seneca forfeited this so-called error by failing to raise it in the trial court. (*Hewlett-Packard, supra*, 65 Cal.App.5th at p. 548.) Indeed, Seneca fails to show that the disposition of its down payment was an issue in this action. (See *Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874 [plaintiff-appellant may not assert new theory of liability on appeal].) It did not request return of its down payment in its complaint. It cites nothing in the record to show this issue was raised at arbitration. And we find no mention of Seneca's right to a return of the down payment in its opposition to respondent's petition to confirm the arbitration award. Moreover, in response to Seneca's new argument, respondent does claim a right to retain the down payment pursuant to the liquidated damages provision in paragraph 21B of the Purchase Agreement.

Under these circumstances, the proper disposition of Seneca's down payment is not before us on appeal. " 'Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider. . . . Bait and switch on appeal not only subjects the parties to avoidable expense, but

29

also wreaks havoc on a judicial system too burdened to retry cases on theories that could have been raised earlier." (*Brandwein v. Butler* (2013) 218 Cal.App.4th 1485, 1519.)

## DISPOSITION

The judgment is modified to provide that respondent shall pay Seneca the sum of $15,908.67, as reimbursement for respondent's share of the JAMS appeal fees. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.


TUCHER, P.J.


WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.